[S.F. No. 24239. June 1, 1982.]

BYRON RUMFORD, SR., et al., Plaintiffs and Appellants, v.
CITY OF BERKELEY, Defendant and Appellant;
ANNE SPARKS et al., Interveners and Appellants.

COUNSEL

Ira G. Deitrick and Black & Deitrick for Plaintiffs and Appellants.

Russell L. Richeda and Carroll, Burdick & McDonough as Amici Curiae on behalf of Plaintiffs and Appellants.

Theodore R. Lakey, Acting City Attorney, Natalie E. West, City Attorney, Richard E. Winnie and Charles O. Triebel, Jr., for Defendant and Appellant.

Jerome B. Falk, Jr., Geoffrey S. Cantrell, Guy T. Saperstein, Farnsworth, Saperstein & Brand and Richard P. Duane for Interveners and Appellants.

OPINION

NEWMAN, J.—This is an appeal from a judgment that mandates the City of Berkeley to remove traffic barriers from over 40 streets. The action was filed by several individuals and Citizens for Legal Action Against the Barricades, an unincorporated association. Other individuals and Berkeleyans for Fair Traffic Management (another unincorporated association) were allowed to intervene. The City and interveners have appealed from the grant of mandate; plaintiffs have cross-appealed, inter alia, from denial of their motion for attorneys' fees.[1]

We must decide whether Berkeley had authority to divert traffic by erecting barriers. We conclude that the judgment mandating removal should be affirmed. As we will explain, the state has preempted the field of vehicular traffic regulation. Berkeley's barriers cannot be justified under either its authority to close streets (Veh. Code, § 21101) or its authority to regulate traffic (§ 21100).[2]

---

[1]The parties will be referred to as plaintiffs, Berkeley or City, and interveners.
[2]All statutory references, unless otherwise indicated, are to the Vehicle Code.

In July 1975 the city council adopted a traffic management plan (TMP) that authorized use of barriers on an experimental basis for the purpose of shifting traffic from "local" streets to those designated "arterial." Within six months the City had installed 41 barriers. In 1976 the TMP was adopted on a permanent basis.

The barriers are various combinations of concrete bollards and redwood boards and are of three types: (1) a full barrier spans the width of a street, preventing all through traffic; (2) a diagonal barrier extends diagonally across an intersection, forcing a turn; (3) a semibarrier extends across half a street, preventing through traffic in one direction. All streets with barriers are accessible to and used by local traffic (e.g., homeowners who live there). The streets on which barriers are placed are streets of the City; none is a state highway. Berkeley has not claimed that any street is no longer needed for vehicular traffic.

The trial court ordered removal of the barriers after finding that they are "traffic control devices" (§ 440) that do not conform to the Department of Transportation uniformity standards and specifications required by sections 21400 and 21401. Appellants contend the barriers are not the type of device that is regulated by the statutes imposing uniformity. Alternatively, they urge, the barriers are authorized by the department's regulations. Interveners make the additional argument that the barriers are permitted by section 21101, which permits a locality to "close" a street it concludes is "no longer needed for vehicular traffic."

Plaintiffs cross-appeal and seek attorney fees pursuant to section 1021.5 of the Code of Civil Procedure. On the merits they argue that Berkeley exceeded its section 21101 authority to close streets. As to section 21100 they point out that if the barriers are not official traffic control devices, as the City and interveners contend, the City has no authority to utilize them. Plaintiffs regard them as traffic control devices that, as the trial court held, do not conform to statutory requirements.

## I. Preemption

"The streets of a city belong to the people of the state, and every citizen of the state has a right to the use thereof, subject to legislative control .... The right of control over street traffic is an exercise of a part of the sovereign power of the state ...." (*Ex parte Daniels* (1920)

183 Cal. 636, 639 [192 P. 442, 21 A.L.R. 1172].)[3] "'The use of highways for purposes of travel and transportation is not a mere privilege, but a common and fundamental right, of which the public and individuals cannot rightfully be deprived . . . [*A*]*ll persons have an equal right to use them for purposes of travel by proper means*, and with due regard for the corresponding rights of others.'" (*Escobedo* v. *State of California* (1950) 35 Cal.2d 870, 875-876 [222 P.2d 1],[4] quoting 25 Am.Jur., Highways, § 163, p. 457; italics added.)

The state's plenary power and its preemption of the entire field of traffic control are stated in Vehicle Code section 21: "Except as otherwise expressly provided, the provisions of this code are applicable and uniform throughout the state and in all counties and municipalities therein, and *no local authority shall enact or enforce any ordinance on the matters covered by this code unless expressly authorized therein.*" (Italics added.) Thus, unless "expressly provided" by the Legislature, a city has no authority over vehicular traffic control. (*Pipoly* v. *Benson, supra,* 20 Cal.2d 366, 371; *Biber Elec. Co.* v. *City of San Carlos* (1960) 181 Cal.App.2d 342, 344 [5 Cal.Rptr. 261].)

The delegated authority of local governments to regulate traffic within their jurisdictions appears in chapter 1, article 3 of the Vehicle Code, sections 21100-21116. Pertinent here are subdivision (d) of section 21100, which permits regulation "by means of semaphores or other official traffic control devices," and subdivision (a) of section 21101, which permits the "[c]losing [of] any highway to vehicular traffic when in the opinion of the legislative body having jurisdiction the highway is no longer needed for vehicular traffic."[5]

■ Keeping in mind that the delegation of power to prescribe traffic rules is strictly construed (*People* v. *Moore* (1964) 229 Cal.App.2d 221, 228 [40 Cal.Rptr. 121]), we now examine sections 21100 and 21101.

---

[3]The regulation of traffic on streets is not one of those "municipal affairs" over which local authorities are given power superior to that of the Legislature. (*County of Los Angeles* v. *City of Alhambra* (1980) 27 Cal.3d 184, 192-193 [165 Cal.Rptr. 440, 612 P.2d 24]; *Pipoly* v. *Benson* (1942) 20 Cal.2d 366, 369 [125 P.2d 482, 147 A.L.R. 515]; Cal. Const., art. XI, § 5.)

[4]Overruled on other grounds, *Rios* v. *Cozens* (1972) 7 Cal.3d 792 [103 Cal.Rptr. 299, 499 P.2d 979], vacated and cause remanded *sub nom. Dept. Motor Vehicles of California* v. *Rios* (1973) 410 U.S. 425 [35 L.Ed.2d 398, 93 S.Ct. 1019], reiterated, 9 Cal.3d 454 [107 Cal.Rptr. 784, 509 P.2d 696].

[5]For our purposes, "street" and "highway" are synonymous terms in the Vehicle Code. (§§ 360, 590.)

## II. Authority to Close Streets

Section 21101 provides: "Local authorities may adopt rules and regulations by ordinance or resolution on the following matters: (a) Closing any highway to vehicular traffic when in the opinion of the legislative body having jurisdiction the highway is no longer needed for vehicular traffic...."[6]

As noted above, only the interveners rely on section 21101. Though Berkeley has described its plan as one for "street closures" it never has attempted to justify its action under section 21101. It never has claimed that any street on which barriers were placed is "no longer needed for vehicular traffic."

Preliminarily we clarify the meaning of "close" and "closure" as used in this opinion. Installing the barriers did not close any street; even those with full barriers permit some traffic. The barriers at most effect a partial closure to certain traffic at certain points. They block through-travel in particular directions but leave all portions of the affected streets open for "local" use.

■ The crucial question is whether section 21101, subdivision (a) provides authority for that kind of partial closure. We conclude it does not.

Subdivision (a) concerns streets no longer needed for vehicular traffic; it does not expressly permit a city to close a street to through traffic while allowing its use for neighborhood purposes. Since that authority

---

[6]Other subdivisions provide: "(b) Designating any highway as a through highway and requiring that all vehicles observe official traffic control devices before entering or crossing the same or designating any intersection as a stop intersection and requiring all vehicles to stop at one or more entrances to the intersection. [¶] (c) Prohibiting the use of particular highways by certain vehicles, except as otherwise provided by the Public Utilities Commission pursuant to Article 2 (commencing with Section 1031) of Chapter 5 of Part 1 of Division 1 of the Public Utilities Code. No ordinance which is adopted pursuant to this subdivision after the effective date of the amendments to this section enacted at the 1969 Regular Session shall apply to any state highway which is included in the national system of interstate and defense highways, except an ordinance which has been approved by the California Highway Commission by a four-fifths vote. [¶] (d) Closing particular streets during regular school hours for the purpose of conducting automobile driver training programs in the secondary schools and colleges of this state. [¶] (e) Temporarily closing a portion of any street for celebrations, parades, local special events, and other purposes when in the opinion of local authorities having jurisdiction such closing is necessary for the safety and protection of persons who are to use that portion of the street during the temporary closing."

must be "expressly (not impliedly) declared by the Legislature" (*Moore, supra,* 229 Cal.App.2d, at p. 228; *Holman* v. *Viko* (1958) 161 Cal. App.2d 87, 93 [326 P.2d 551]), we should not imply a grant of authority here.

That the words "closing any highway to vehicular traffic" mean exactly what they say is indicated by the first case that considered the statute (or more precisely its predecessor, § 145), *Simpson* v. *City of Los Angeles* (1935) 4 Cal.2d 60 [47 P.2d 474]. Apparently the statute in fact was enacted to cover the *Simpson* situation; i.e., the closing of Olvera Street in Los Angeles.

Olvera Street was one-block long, bounded at each end by thoroughfares. It was used principally for parking of commercial vehicles and by pedestrians; it was little used for movement of vehicular traffic. In 1929 Los Angeles enacted an ordinance closing it to vehicular traffic. An abutting property owner disputed the city's right to close the street; the trial court upheld the enactment under the city's police power. When the ordinance was passed section 145 did not confer power to close streets; while the case was pending the Legislature in 1931 amended the section to permit closure when, in the view of the city's legislative body, the street was no longer needed for vehicular traffic.

Addressing arguments that Los Angeles had authority to close streets that was implied in the delegation contained in the statute's earlier version, this court noted that the legislative intent "was made manifest" when in 1931 the express authority was added to the statute. "[A] reversal of the judgment herein would avail the plaintiff nothing," said the court, "inasmuch as the city council could immediately validly reenact the ordinance. Furthermore, it is represented in the record that the very purpose of enacting the 1931 amendment to section 145 was to preserve the validity of the ordinance in question." (P. 67.)

The next case was *Snyder* v. *City of South Pasadena* (1975) 53 Cal.App.3d 1051 [126 Cal.Rptr. 320]. South Pasadena had erected a full-length barrier on a street at the boundary with Los Angeles, to prevent Los Angeles traffic from turning onto the street. The city council had resolved that the street was "no longer needed and never had been needed as a conveyor of through traffic. . . ." The trial court denied Los Angeles residents' request for an injunction; the Court of Appeal upheld the closure, finding authority (1) in the city's police powers, (2) in the delegated authority to "maintain streets," (3) in the language of the

*Simpson* case, and (4) in a "liberal" interpretation of subdivision (a) of section 21101. In our view the Court of Appeal erred.

First, a city's police powers do not extend to control of vehicular traffic on its streets; that field has been preempted (§ 21). Second, the delegated power to "maintain" streets refers not to traffic control but to the power (and responsibility) to repair or improve streets and to construct overpasses, tunnels, or sidewalks (Gov. Code, § 40401; *Irwin* v. *City of Manhattan Beach* (1966) 65 Cal.2d 13, 22 [51 Cal.Rptr. 881, 415 P.2d 769]). Third, the *Simpson* decision was premised on the validation of the city's action by the Legislature's enactment of subdivision (a). Finally, the court in *Snyder* ignored the rule that delegations of power to cities regarding vehicular traffic will be strictly construed (*Moore, supra*, 229 Cal.App.2d 221, 228; *Holman, supra*, 161 Cal. App.2d 87, 93), as well as the rule of construction that words normally should be read for their "plain meaning." (*People* v. *Belleci* (1979) 24 Cal.3d 879, 884 [157 Cal.Rptr. 503, 98 P.2d 473]; *Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 658 [147 Cal.Rptr. 359, 580 P.2d 1155]; *Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148].)

The only other case interpreting subdivision (a), *City of Lafayette* v. *County of Contra Costa* (1979) 91 Cal.App.3d 749 [154 Cal.Rptr. 374], was decided four years later. Lafayette installed a gate across the entrance to Happy Valley Road, thereby closing it to traffic except for drivers with an accepted need to use the road; they were furnished gate-opening devices.

The Court of Appeal held that subdivision (a) provided no authority for partial closure. The opinion referred to (1) state preemption (§ 21), (2) the requirement that authority be expressly conferred and delegations strictly construed, and (3) the fact that the statute authorizes only the "closing" of a street and, by its unambiguous text, permits only the complete shutting off of a street when it is "no longer needed" for traffic. The court concluded that subdivision (a) provides no authorization to limit a street to local traffic and that implying an authority to do so was "contrary to law, and to the clear language of that statute." (91 Cal.App.3d at p. 757.)

Lafayette's diverter, which permitted through traffic to some drivers and not others, was not precisely analogous to any of the three types of Berkeley barriers. Yet insofar as it permitted unimpeded travel to driv-

ers on each side of the barrier the Lafayette device was comparable to all those installed in Berkeley. Whatever the subtle differences the principle is the same; the street has been partially closed or, more precisely, closed to some vehicular traffic.[7]

Most traffic laws are to some extent discriminatory. In large measure they determine which traffic may use streets under what circumstances. Nonetheless, localities have no carte blanche and, absent express authority, may not determine which traffic shall and which shall not use streets.

Interveners' argument that the Legislature intended section 21101, subdivision (a) to provide authority not only for complete closure but also for traffic control by restricting use does not withstand scrutiny. Interpretation of subdivision (a) to permit regulation by partial closure would render superfluous section 21100 (which specifies in detail how local governments may regulate traffic) as well as many other, more explicit, traffic control statutes. (See discussion *post.*) We conclude that partial closing of the Berkeley streets is not authorized by section 21101, subdivision (a).[8]

### III. AUTHORITY TO REGULATE TRAFFIC

■ Berkeley contends that its barriers implement a traffic control plan and therefore are authorized as a means of controlling traffic.[9] Apart from "closure" of streets (§ 21101, subd. (a), *supra*), the statutes do permit local governments to "regulate" traffic in certain ways. We conclude, however, that the barriers are not included within that power since they are "official traffic control devices" that do not conform to uniform standards and specifications of the Department of Transportation.

---

[7]Interveners attempt to distinguish *Lafayette* as a case permitting partial closure so long as it is not discriminatory. But the opinion is clear: a contention that subdivision (a) "*impliedly* granted authority for partial closure of Happy Valley Road is contrary to law, and the clear language of that statute." (91 Cal.App.3d, at pp. 756-757.) *Lafayette* required removal of the barrier because the city had no authority partially to close the street, not because closure discriminated between residents and nonresidents.

[8]Insofar as *Snyder v. City of South Pasadena, supra,* 53 Cal.App.3d 1051 conflicts with views expressed here it is disapproved.

[9]Berkeley takes the extreme position that it has authority to design and place traffic control devices free from state restraint. In view of section 21 and the explicit preemption of regulating traffic and those devices, the contention seems so erroneous that we do not elaborate on it.

The principal grant of local authority over traffic control is contained in section 21100, which provides among other things that cities may "regulat[e] traffic by means of semaphores or other official traffic control devices." (Subd. (d).)[10] Section 21351 gives the right to install traffic control devices necessary to warn or guide traffic. Other statutes grant even more-explicit powers, including the right to erect stop signs (§§ 21351.5, 21354, 21355) and yield right-of-way signs (§ 21356), and to designate all or any portion of a street for one-way traffic (§ 21657). However, "[o]nly those official traffic control devices that conform to the uniform standards and specifications promulgated by the Department of Transportation shall be placed upon a street or highway." (§ 21401.)

Section 440 defines "official traffic control device." Prior to 1980 the definition included "any sign, signal, marking or device not inconsistent with this code, placed or erected by authority of a public body or official having jurisdiction, for the purpose of regulating, warning or guiding traffic." Section 21400 provides that the Department of Transportation "shall, after consultation with local agencies and public hearings, adopt rules and regulations prescribing uniform standards and specifications for all official traffic control devices placed pursuant to the provisions of this code . . ." Those standards and specifications are set out in California Administrative Code, title 21, sections 1409.1-1409.9. The trial court ruled that the Berkeley barriers are traffic control devices as defined in section 440 but noted that they are not mentioned in regulations 1409.1-1409.9.[11] Hence, it concluded, they must be removed because they do not conform to standards and specifications mandated by section 21400.

---

[10]In 1975, when Berkeley's TMP was adopted, section 21100 provided: "Local authorities may adopt rules and regulations by ordinance or resolution regarding the following matters: [¶] (a) Regulating or prohibiting processions or assemblages on the highways. [¶] (b) Licensing and regulating the operation of vehicles for hire and drivers of passenger vehicles for hire. [¶] (c) Regulating traffic by means of traffic officers. [¶] (d) Regulating traffic by means of semaphores or other official traffic control devices. [¶] (e) Regulating traffic by means of any person given temporary appointment for such duty by the local authority whenever official traffic control devices are disabled or otherwise inoperable. [¶] (f) Regulating traffic at the site of road or street construction or maintenance by persons authorized for such duty by the local authority. [¶] (g) Licensing and regulating the operation of tow car service. [¶] (h) Operation of bicycles, and, as specified in Section 21114.5, electric carts by physically disabled persons, or persons 50 years of age or older, on the public sidewalks. . . ."

[11]Regulations 1409.1-1409.8 repeat the standards and specifications previously contained in statutes repealed on the enactment of section 21400. (Sections 21402 to 21406, repealed in 1969, related to yield signs, speed signs, warning-approach signs, and street-and-highway signs.) The effect of section 1409.9 is discussed below.

The City and interveners first contend that the barriers are not devices contemplated by section 440. That section, they argue, is limited to signs, signals, and other devices that communicate by symbol. As plaintiffs point out, the contention seems self-defeating, for to conclude that barriers are not "official traffic control devices" removes the only arguable authority for installing them, namely, the delegation of authority to regulate by "official traffic control devices." (§§ 21100, 21401.)

Further, section 21400 states that it applies to "all official traffic control devices placed pursuant to the provisions of this code, including, but not limited to, stop signs, yield right-of-way signs, [and] speed restriction signs . . . ." Finally, whatever questions may have existed as to the applicability of the requirements to *all* traffic devices were resolved by 1980 amendments to sections 440 and 21100. Section 440 now defines an official traffic control device as "any sign . . . or device, consistent with Section 21400" that is placed for the purpose of traffic control. And subdivision (d) of section 21100 now permits regulating traffic "by means of official traffic control devices meeting the requirements of section 21400."

The City and interveners suggest that if "official traffic control devices" are not limited to signs and signals they necessarily include not only barriers but other diverters such as median strips, pedestrian islands, sidewalk curbs, road shoulders, traffic circles, and the like. Those methods of traffic control, like barriers, require no uniformity, it is urged, since their meaning is direct rather than symbolic; traditionally they have been deemed within charter cities' power over municipal affairs.

The dilemma is more apparent than real. As we have seen, the statutes and cases distinguish between cities' broad powers to *construct and maintain* streets (e.g., Gov. Code, § 40401, *supra*; Sts. & Hy. Code, § 5101; *Irwin v. City of Manhattan Beach, supra*, 65 Cal.2d 13, 22; *City of Walnut Creek v. Silveira* (1957) 47 Cal.2d 804, 812 [306 P.2d 453]) and their lack of authority to regulate traffic on streets in use, except by authorized "traffic control devices." Relatively permanent, physical changes in the width or alignment of roadways that are effected by islands, strips, shoulders, and curbs clearly are within the construction and maintenance power (*Walnut Creek, supra*) though of course they may alter patterns of traffic.

The Berkeley barriers, however, make no basic structural changes. Like signs and signals they leave existing surfaces in use; their only effect is to control the circumstances of use. They are not part of the street itself; they are rather "devices . . . placed *upon* a street" (§ 21401; italics added) *"for the purpose* of regulating, warning, or guiding traffic" (§ 440; italics added). Thus it appears that they are traffic control devices permissible only if they "conform to the uniform standards and specifications promulgated by the Department of Transportation." (§ 21401.)

The sole issue that remains is whether the department has promulgated "uniform standards and specifications" respecting barriers used for traffic control. We can find no standards or specifications among the department's regulations. Indeed, no one suggests that barriers are covered by regulations 1409.1 through 1409.8. Interveners, putting aside their allegation that the department has not undertaken to provide explicit standards, suggest that blanket approval is contained in regulation 1409.9. We do not agree.

Regulation 1409.9 provides: "All official traffic control devices placed or erected after November 10, 1969, which are not specifically covered by these regulations, and all official traffic control devices placed or erected prior to November 10, 1969, shall conform to the statutory requirements, if any, in effect at the time of their installation." The precise meaning and purpose of the regulation are not readily apparent from reading it. Interveners suggest that except as provided in regulations 1409.1 to 1409.8, the department intended to approve all devices not prohibited by statute when they were installed.

Even so the regulation does not validate the barriers. The department must "adopt rules and regulations *prescribing* uniform standards and specifications for *all* official traffic control devices" (§ 21400; italics added), and only the devices that meet those standards and specifications may be erected (§ 21401). Regulation 1409.9 does not set uniform standards and specifications for devices of the type Berkeley has placed on its streets. Nor does it incorporate standards and specifications by reference. There were no "statutory requirements" concerning barriers at the time Berkeley installed them (see reg. 1409.9), and there are none now.

Regulatory interpretation of statutes is entitled to weight but cannot contravene legislative intent. (See *Woods* v. *Superior Court* (1981) 28

Cal.3d 668, 679 [170 Cal.Rptr. 484, 620 P.2d 1032]; *Mooney v. Pickett* (1971) 4 Cal.3d 669, 679 [94 Cal.Rptr. 279, 483 P.2d 1231].) To the extent regulation 1409.9 purports to authorize traffic control devices not subject to specific standards adopted by the department, it violates sections 21400 and 21401. Therefore, it cannot empower the City to place nonconforming barriers for the purpose of regulating traffic.

Interveners foretell chaos if we rule that diverters are not lawfully placed on streets because they do not comply with the regulations. They argue that other, commonly used devices are likewise not the subject of regulations. That fact does not persuade us to hold the barriers lawful. First we stress that the legality of devices other than barriers is not before us. Second we note that certain devices in common use but not covered by regulations in the Administrative Code appear nonetheless to have been installed in accordance with standards and specifications set forth in the department's traffic manual.[12]

We need not decide here the manual's legal effect or the propriety of its use to satisfy the requirements of section 21400. For our purposes the critical fact is that *the manual, like the code, contains no standards or specifications for diverters of the kind used by Berkeley.*[13]

The Berkeley barriers may not be justified as an exercise of the authority to close streets (§ 21101, subd. (a)) or to install traffic control devices (§ 21100, subd. (d)). We therefore affirm the judgment that orders their removal.

---

[12]At trial the traffic manual was described by expert witnesses as the "bible" of traffic management. The disclaimer in the foreword, that "It is neither designed as, nor does it establish, a legal standard for these [traffic] functions," perhaps was intended to avoid civil liability.

For discussion of the use of manuals and other "house rules" by agencies in the exercise of quasi-legislative power and the avoidance thereby of procedures prescribed by the Administrative Procedure Act (Gov. Code, § 11342 et seq.) see *Armistead v. State Personnel Board* (1978) 22 Cal.3d 198 [149 Cal.Rptr. 1, 583 P.2d 744], in which we invalidated a rule contained in the agency's personnel transaction manual because it was not promulgated pursuant to procedures required by the APA.

[13]Perusal of the manual reveals specifications for all manner of traffic devices such as traffic-light installations, school-crossing signs, and signs warning of curves, hills, and dead-end streets. The only barricades for which standards and specifications are provided are those used to protect the public during street construction or maintenance activities; and, for those, detailed requirements are set.

## IV. Attorney Fees

■ The question remains of attorney fees. At time of trial, the Legislature had yet to codify the private-attorney-general fee theory (Code Civ. Proc., § 1021.5); hence, the trial court denied plaintiffs' fee request without the benefit of that statute.[14]

Since this case was pending on appeal when section 1021.5 became effective, the statute applies. (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 932 [154 Cal.Rptr. 503, 593 P.2d 200].) Whether plaintiffs have met its requirements for an award of trial and appellate fees, and the reasonable amount of any award, are questions best decided by the trial court. (*Id.*, at p. 932 et seq.; see also *Sierra Club* v. *City of Hayward* (1981) 28 Cal.3d 840, 864 [171 Cal. Rptr. 619, 623 P.2d 180]; *Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 620 [156 Cal.Rptr. 718, 596 P.2d 1134]; cf. *American City Bank* v. *Zetlen* (1969) 272 Cal.App.2d 65, 67 [76 Cal.Rptr. 898].) Therefore, we remand for a determination of the propriety and amount of trial and appellate fees.

The judgment is affirmed insofar as it directs removal of the Berkeley barriers. It is reversed insofar as it denies plaintiffs' request for attorney fees, and the cause is remanded for further proceedings on that issue. The trial court is authorized to award trial and appellate fees if it determines that this case has "resulted in the enforcement of an important right affecting the public interest" and conferred a "significant benefit ... on the general public or a large class of persons," and that "the necessity and financial burden of private enforcement are such as to make the award appropriate." (Code Civ. Proc., § 1021.5 and subds. (a), (b).) The trial court shall determine the amount of any fees to be awarded.

Mosk, J., Richardson, J., and Broussard, J., concurred.

---

[14]Section 1021.5, effective January 1, 1978, provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

**BIRD, C. J.**—I respectfully dissent.

Today, the majority of this court prohibit the City of Berkeley from effectively solving a local traffic problem by means which are expressly authorized by the Vehicle Code. In reaching their conclusion, the majority misconstrue relevant case law, interpret applicable code provisions too narrowly, and ignore the legislative policy that cities adopt traffic circulation plans designed to meet local needs. (Gov. Code, §§ 65300, 65302, subd. (b), 65303, subd. (c).)

## I.

The Berkeley diverters were installed to implement the city's plan to reduce vehicular traffic in residential neighborhoods. Adoption of this plan followed extensive engineering studies concerning traffic circulation in Berkeley. Numerous public hearings were held before the planning commission and city council. On two occasions a majority of the city electorate rejected proposals to have the diverters removed.

Contrary to what is stated in the majority opinion's abbreviated statement of facts, the first traffic diverters were installed in 1964. In 1968, after several public hearings, the city council revised its traffic circulation plan to specifically provide for the reduction of "unnecessary" through traffic in residential neighborhoods by utilizing diverters and other traffic control devices. By 1975, 27 diverters had been installed on various city streets.

In 1972, the city commissioned a private consulting firm to develop a more comprehensive plan "to protect all neighborhoods from undue vehicular traffic." The resulting "Neighborhood Traffic Study" was discussed at public hearings before the planning commission in February and March of 1975. As a result of the study, the planning commission recommended to the city council that a new traffic circulation plan be implemented and that more traffic diverters be installed.

On July 8, 1975, the city council adopted the traffic management plan (TMP) on an experimental basis. Pursuant to this plan, the city installed 14 additional diverters on residential streets. A study of the first six months of the experimental program found that the diverters had succeeded in decreasing vehicular traffic on most neighborhood streets and in reducing the overall number of traffic accidents and fatalities in Berkeley. Upon reviewing the results of the study in several public

meetings, the city council adopted the TMP as a permanent program on October 5, 1976.

After their installation, the traffic diverters were the subject of two initiative measures. In June of 1976, the Berkeley electorate voted to defeat a proposal to have the barriers removed by a margin of 57 percent to 43 percent. A similar measure was also defeated in April of 1977.

II.

In order to place the issue raised by this case in perspective, it is initially necessary to identify those traffic-management powers which Berkeley indisputably possesses. The majority opinion leaves the impression that these powers are few. However, under the Government Code, Berkeley is required to prepare and adopt a comprehensive general plan for managing its physical growth and development. (Gov. Code, § 65300.) This plan must contain a traffic circulation element which, in turn, may cover all aspects of city traffic management. (Gov. Code, §§ 65302, subd. (b), 65303, subd. (c).)

Implicit in this state-mandated local planning process is the recognition by the Legislature that physical growth and development problems will vary from city to city. Accordingly, each city has broad power to adopt a circulation element in its general plan that is designed to solve the particular traffic problems of that locality.

Here, Berkeley sought to protect its residential neighborhoods from the safety and environmental hazards caused by excessive vehicular traffic. Plaintiffs do not dispute that the city had the authority to adopt a traffic circulation plan to accomplish this objective.

Also, no challenge is raised concerning the traffic patterns resulting from Berkeley's implementation of the TMP. Indeed, it is conceded that the city could have properly used traffic signs and road surface markings to direct traffic in the same manner. For example, the city could have installed right or left turn only signs instead of diagonal diverters. Like the diverters, these signs would have prohibited oncoming traffic from passing through an intersection and required the vehicles to turn in a given direction. Similarly, a combination of appropriate traffic signs placed at an intersection would have had the same effect on the flow of traffic as either a full or semi-diverter. Indeed, a street that

ends in a full diverter is nothing other than a street that has been designated a deadend.

It is also clear that the city could have rerouted traffic in the same manner as accomplished by the diverters if the configuration of its streets were changed. Section 5101 of the Streets and Highways Code provides cities with broad authority to make physical alterations in streets "[w]henever in the opinion of the legislative body the public interest or convenience may require . . . ." (See also *City of San Jose* v. *Lynch* (1935) 4 Cal.2d 760, 764 [52 P.2d 919].) A city "may order the whole *or any portion*, either in length *or in width*, of any one or more of [its] streets . . . to be improved by or have constructed . . . thereon . . . ¶ (b) . . . sidewalks, . . . curbs, [and] gutters . . . ." (Sts. & Hy. Code, § 5101, subd. (b), italics added.)

Here, Berkeley could have controlled traffic by erecting sidewalks or curbs where the diverters now stand. Indeed, photographs introduced at trial revealed that other municipalities frequently construct curbs or medians to divert traffic from continuing along a particular street.

Thus, in seeking this writ of mandate, plaintiffs only challenge Berkeley's decision to use diverters to implement its plan to reduce traffic in residential neighborhoods.[1]

### III.

Whether Berkeley may properly employ diverters to control traffic hinges on whether express authority for placement of the diverters exists in the Vehicle Code. (Veh. Code, § 21.)[2] Two sources of authority are present. First, under section 21101, subdivision (a), a city may "[c]los[e] any highway to vehicular traffic when in the opinion of the legislative body having jurisdiction the highway is no longer needed for vehicular traffic."[3] The power to close streets "to vehicular traffic" encompasses the authority to close streets to through traffic by the install-

---

[1]The reasonableness of the city's decision to install diverters seems beyond dispute. The diverters physically block the passage of traffic. Unlike traffic signs, they cannot be easily disobeyed. In addition, the number and variety of signs that would be required to achieve the same traffic patterns would probably confuse motorists. Finally, the diverters are not permanent fixtures. Thus, as the needs of the community change, they can be relocated more easily and with less expense than curbs or other physical constructions.

[2]Unless otherwise indicated, all further statutory references are to the Vehicle Code.

[3]As explained in the majority opinion (see maj. opn., *ante*, at p. 550, fn. 5), for purposes of this section "street" and "highway" are synonymous terms. (See §§ 360, 590.)

ation of traffic barriers.[4] (*Snyder v. City of South Pasadena* (1975) 53 Cal.App.3d 1051 [126 Cal.Rptr. 320].)

In *Snyder*, the City of South Pasadena concluded that a certain street was not needed as a conveyor of through traffic and that a large volume of traffic was destroying the residential nature of the surrounding neighborhood. Accordingly, the city installed a barrier across the entire width of the street at an intersection just inside the Los Angeles border. The barrier closed the street to through traffic in either direction, but allowed local traffic access to residences on either side of the divider.

The Court of Appeal held that South Pasadena's closing of the street to through traffic was authorized by Vehicle Code section 21101, subdivision (a). (*Id.*, at pp. 1057-1059.) The court reasoned that a narrow reading of the statute to allow only complete closures of streets would be "strained." (*Id.*, at p. 1058.) A locality could consider, the court concluded, the intended use of a street for residential purposes in making the required preliminary determination that a street was not needed for vehicular traffic. (*Id.*, at pp. 1058-1059.)

*Snyder* is controlling in the present case. The Court of Appeal's interpretation of the code section comports with the well-settled rule of statutory construction that "statutes are to be given a reasonable and common sense construction." (*Fireman's Fund Ins. Co. v. Security Pacific Nat. Bank* (1978) 85 Cal.App.3d 797, 815 [149 Cal.Rptr. 883].) Certainly, a city's authority to close a street to vehicular traffic includes the right to close a street to through traffic if the street is not needed for that purpose.

Moreover, such an interpretation does not violate the "plain meaning" of the code section. The language of the statute is sufficiently flexible to allow for the closure of streets to only through traffic. "[V]ehicular traffic," as used in the statute, does not necessarily refer to *all* vehicles which seek to use the street for any purpose.

Here, the full diverters installed by Berkeley have the identical effect on the flow of traffic as the barrier erected by South Pasadena. As in the *Snyder* case, Berkeley's purpose in closing the streets to through traffic was to preserve the residential character of the neighborhoods involved. Plaintiffs concede that a legislative finding that these streets were not needed for through traffic was implicit in the extensive stud-

---

[4]Plaintiffs concede that if section 21101, subdivision (b) allows closure of a street to through traffic, the city may install diverters to effect that closure.

ies, lengthy deliberations and public hearings conducted by the city council prior to the adoption of the TMP. This implied finding of fact satisfied the requirement of *Snyder* and the terms of the code section. Heretofore, written findings of fact have not been generally necessary in legislative proceedings. (*City of Santa Cruz v. Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 389-391 [142 Cal.Rptr. 873]; *Ensign Bickford Realty Corp. v. City Council* (1977) 68 Cal.App.3d 467, 472-473 [137 Cal.Rptr. 304].)

The majority's reliance upon *City of Lafayette v. County of Contra Costa* (1979) 91 Cal.App.3d 749 [154 Cal.Rptr. 374] for the proposition that section 21101, subdivision (a) does not authorize the "partial closure" of streets is misplaced. (Maj. opn., *ante*, at pp. 553-554.) The majority fail to recognize that "partial closure," as used in *City of Lafayette*, does not mean the closure of streets for certain purposes such as through traffic in one or both directions. "Partial closure" in *City of Lafayette* refers only to the closure of streets to some persons, but not others.

The gate which Lafayette sought to erect across the width of Happy Valley Road would have prevented only nonresidents from driving the length of that street. Resident motorists were to be furnished with devices which would enable them to open the gate and drive through. The Court of Appeal held that Lafayette "was without police power, or other authority, to deny use of Happy Valley Road to some members of the traveling public, while granting it to others." (*Id.*, at pp. 752-753, see also *id.*, at p. 757.)

The holding in *City of Lafayette* was limited to the unique facts of that case. The opinion by the court makes this fact abundantly clear. The Court of Appeal found *Snyder* to be inapposite because the South Pasadena barrier prohibiting through traffic did not discriminate between city residents and nonresidents. (*Id.*, at p. 757.) In addition, the court emphasized that "[the city's] right to close the road, or a portion of it, to *all persons* by 'a permanent barricade' was neither sought, nor litigated, nor otherwise at issue at the trial.... We, of course, make no determination in respect of the City's right, if any, to erect such a permanent barricade." (*Id.*, at p. 758, italics added.)

In this case, the diverters installed by Berkeley are not proscribed by the holding in *City of Lafayette* since they effectively close streets to *all* through traffic in one or both directions. Installation of these diverters

was authorized by section 21101, subdivision (a) as correctly construed by *Snyder*.[5]

A second source of authority for Berkeley's use of diverters to reroute traffic may be found in section 21100, subdivision (d). This statute, as it presently reads, generally authorizes cities to "[r]egulat[e] traffic by means of official traffic control devices meeting the requirements of Section 21400."[6] Both parties stipulated at trial that the city's diverters are "traffic control devices." (See § 440.) Section 21400 provides that the Department of Transportation (DOT) "shall, after consultation with local agencies and public hearings, adopt rules and regulations prescribing uniform standards and specifications for all official traffic control devices placed pursuant to the provisions of this code,..."

Under this statutory scheme, the pertinent inquiry is whether Berkeley's diverters conform to the prescribed standards. These standards are set forth in title 21, California Administrative Code, sections 1409.1-1409.9. These regulations provide uniform specifications for seven different devices. (Cal. Admin. Code, tit. 21, §§ 1409.2-1409.8.) Traffic barriers are not among those specifically covered. However, section 1409.9 provides that "[a]ll [other] official traffic control devices ... shall conform to the statutory requirements, if any, in effect at the time of their installation."

Thus, section 1409.9 allows cities to install traffic control devices for which uniform standards have not been promulgated so long as the devices conform to any statutory requirements in effect when they were installed. Since Berkeley's traffic diverters did not contravene any statu-

---

[5]The majority opinion also relies on *Simpson v. City of Los Angeles* (1935) 4 Cal.2d 60 [47 P.2d 474] which upheld a Los Angeles ordinance closing a one-block street to all vehicular traffic. The court found that the street closing was within the city's police power. (*Id.*, at p. 67.) While the case was pending, the Legislature passed the predecessor to section 21101, subdivision (a). One party represented to the court that this statute was enacted in order to preserve the validity of the Los Angeles ordinance. (*Id.*, at p. 67.) This fact, however, does not mean that the Legislature necessarily intended to prohibit the closure of streets to some traffic. Had the Legislature sought that result, the language of the statute would have more clearly stated such an intent.

[6]The mandate that official traffic control devices must meet the requirements of section 21400 was added by amendment in 1980. (Stats. 1980, ch. 671, § 2, p. 1865.) This amendment merely made explicit in section 21100, subdivision (d) what was already required by sections 21400 and 21401.

tory standards existing "at the time of their installation," their use in implementing the TMP was valid under section 1409.9.

A contrary conclusion would necessarily lead to anomalous results. Many commonly used and essential traffic control devices, including traffic signals and one-way street signs, are not specifically regulated.[7] Thus, if traffic diverters are not authorized by section 1409.9, all other devices and signs for which specific regulations have not been promulgated by the DOT are invalid.

The majority opinion fails to come to grips with the absurd result that will ineluctably follow from its holding. According to the majority, certain devices, which are not specifically covered by the regulations, have been installed in accordance with standards prescribed in the DOT traffic manual. (Maj. opn., *ante,* at p. 558.) However, the provisions of the traffic manual are *not* rules and regulations promulgated pursuant to Vehicle Code section 21400. Therefore, they do not validate the traffic control devices contained therein. At trial, a DOT traffic engineer described the manual as an "in-house document" which merely provides guidelines for the DOT in traffic matters.[8] The manual itself contains the disclaimer that "[i]t is neither designed as, nor does it establish, a legal standard for these [traffic] functions."

Moreover, the provisions of the traffic manual cannot be considered rules and regulations for official traffic control devices since the manual was not promulgated in accordance with the procedural requirements of section 21400 and the Administrative Procedure Act. (Gov. Code, § 11342 et seq.) Section 21400 requires the DOT to consult with local agencies and conduct public hearings before adopting any regulations concerning traffic control devices. The Administrative Procedure Act also establishes a number of procedures with which administrative agencies promulgating regulations must comply. These procedures include public notice of the proposed action, an opportunity for the public to be heard, the filing of the regulations with the Secretary of State,

---

[7]The regulations only establish uniform standards for the following traffic control devices: stop signs, yield right-of-way signs, speed signs, warning approach signs for railroad crossings, street and highway name signs, warning devices for road work interfering with traffic, and two-way left-turn lanes.

[8]The engineer also testified that while the manual covers most traffic control devices, it does not prescribe standards for all devices employed by the DOT. Thus, even if the manual's provisions are considered regulations, some traffic devices used by the DOT would still be invalid unless section 1409.9 of title 21, California Administrative Code is construed as a "stop gap" measure.

and the publication of the regulations in the Administrative Code. (Gov. Code, §§ 11343-11343.9, 11346-11347.3.) There is no dispute that the traffic manual was not published in accordance with the procedural requirements of Vehicle Code section 21400 and the Administrative Procedure Act. Hence, the manual's provisions cannot be deemed regulations within the meaning of section 21400.[9]

Finally, it should be emphasized that approval of the city's use of diverters to regulate vehicular traffic in residential neighborhoods does not interfere with the policy underlying the uniformity requirement of Vehicle Code section 21400. The purpose of this requirement is to ensure that all motorists understand the meaning of the devices which municipalities use to control traffic. With common regulatory devices such as traffic signals, where information is communicated indirectly through symbols, the need for uniformity is especially acute. By contrast, the city's diverters directly convey traffic information to motorists by physically obstructing the passage of vehicles. Thus, the absence of any regulations establishing uniform standards for diverters does not lead to confusion among motorists.

## IV.

In this case, the City of Berkeley was faced with a local traffic problem. Excessive vehicular traffic threatened the residential character of certain neighborhoods. To preserve its neighborhoods and to reduce vehicular use of residential streets, Berkeley adopted a traffic circulation plan that provided for the installation of a system of traffic diverters. The use of diverters to close streets to through traffic in one or both directions was within Berkeley's authority under the Vehicle Code.

Reynoso, J.,* concurred.

The petitions of defendant and appellant and interveners and appellants for a rehearing were denied July 14, 1982. Kaus, J., did not participate therein. Bird, C. J., was of the opinion that the petitions should be granted.

---

[9]The majority states that for purposes of this case, the critical fact is that "the manual ... contains no standards or specifications for diverters of the kind used by [Berkeley]." (Maj. opn., *ante*, at p. 558, fn. omitted, italics omitted.) This fact, however, is meaningless since the manual's provisions do not set forth valid regulations for traffic control devices.

*Assigned by the Chairperson of the Judicial Council.