[No. B077760. Second Dist., Div. Seven. Mar. 23, 1994.]

CITIZENS AGAINST GATED ENCLAVES et al., Plaintiffs and Respondents, v.
WHITLEY HEIGHTS CIVIC ASSOCIATION, Defendant and Appellant.

## COUNSEL

Latham & Watkins, David F. Faustman and Alyssa J. Allen for Defendant and Appellant.

Ronald A. Zumbrun, James S. Burling and Orrin F. Finch as Amici Curiae on behalf of Defendant and Appellant.

Hall & Associates, Carlyle W. Hall, Jr., Leon Dayan, Gus T. May and Brent N. Rushforth for Plaintiffs and Respondents.

## OPINION

**WOODS (Fred), J.**—Defendant Whitley Heights Civic Association (Association), an association of homeowners, appeals from a judgment in favor of plaintiff Citizens Against Gated Enclaves (CAGE) and two individual plaintiffs. The court found that pursuant to Vehicle Code section[1] 21101.6, the Association was prohibited from placing gates on its streets.

The Association contends that since the City of Los Angeles (City) withdrew the streets of Whitley Heights from public use pursuant to Government Code sections 37359 and 37361, section 21101.6 was not applicable as it only prohibits partial closure of public streets, whereas the closure here was total and the streets were private. We affirm as we conclude that since the City had no authority to withdraw the streets from public use, section 21101.6 was properly applied.

### FACTUAL AND PROCEDURAL SYNOPSIS

#### I. *Factual Background*

##### A. *Whitley Heights*

Whitley Heights is a neighborhood in the Hollywood Hills of Los Angeles, bound on the south by Franklin Avenue, on the west by Highland Avenue and on the north and east by Cahuenga Boulevard. Whitley Heights sits on a hill. The upper half of the hill consists almost exclusively of single-family homes; the lower half consists almost exclusively of apartment buildings and multiple residential housing.

Whitley Heights was planned and largely built by Hobart Johnstone Whitley, often called " 'The Father of Hollywood.' " He purchased the

---

[1]Unless otherwise noted, all statutory references are to the Vehicle Code.

property in 1901. When the property was subdivided, the ownership of the land passed on to the homeowners. The property owners maintain ownership in fee of all of the property within the Whitley Heights area, including the land on which the streets are located.

When Whitley Heights was originally subdivided in June 1903, the concept of hillside development was new. Flights of pedestrian steps built to connect different levels of the hill are still in use today.

The area was developed slowly during the first two decades. It was planned as a single-family residential area, designed to resemble a Mediterranean hillside village. There were architectural restrictions and a view guarantee. Over three-fourths of the homes were constructed to those specifications and remain mostly unaltered.

Many of the homes were designed by noted architects. The neighborhood has always been associated with the film and theater industries.

Whitley Heights is a California State Historic District, is listed on the United States Department of the Interior's National Register of Historic Places and has been designated by the City as a historic preservation overlay zone.

The streets at issue here were dedicated to public use in 1920 and 1921. The City constructed the streets between 1924 and 1927.

The streets, most with no sidewalks, and stairs from level to level, were designed to encourage residential walking. The streets are secondary, "local" streets, and many are narrow and winding in character, with much variation in street grades and many cul-de-sacs.

A number of the streets are through streets, albeit circuitous ones, which allow persons who live in apartments to reach Highland Avenue directly from their homes without having to use the often congested Franklin Avenue.

B. *The Withdrawal Agreement*

By the late 1970's, the area was subject to increasing violence, crime and graffiti. The Association wrote its councilwoman that gating was a possible solution to those problems.

In the early 1980's, residents of the area began to pool their money and efforts to pursue construction of gates to protect their neighborhood. The

Association started by seeking approval for the project from the City. A residents' petition supporting closure was sent to the City.

Between 1981 and 1985, members of the Association held several meetings with the city attorney's office and other City representatives to discuss the project. The City determined that the streets would need to be withdrawn from public use. Several public hearings were held. Withdrawal of the streets was supported by the city engineer's office.

On February 28, 1985, the city planning commission reviewed the city engineer's report and approved the project. A notice was sent to owners of property within 300 feet of the area. After a public hearing, the public works committee recommended to the city council that the project be approved. In 1985, pursuant to Government Code sections 37359 and 37361, the city council ordered the withdrawal from public use of streets, sidewalks, walkways and stairways within the Whitley Heights area.

The City's withdrawal is memorialized in the withdrawal agreement (Agreement) with the Association whereby the City purported to withdraw Whitley Heights streets and sidewalks from public use so that the Association could place gates on them to restrict access to residents of the houses inside the gates, their invitees and operators of emergency vehicles.

## C. *The Gating Project*

After the Agreement was signed, the City issued a permit to the Association to allow the installation of the gates. Construction began in January 1991 and was substantially completed by April 1992, at a cost of more than $350,000 to the homeowners. There are currently seven nonoperating gates encircling the streets and sidewalks in the upper part of the neighborhood.

Shortly after construction began, a number of residents outside the gated area learned of the gating project for the first time. They began to take action in opposition to the gates, including gathering signatures for a petition to their city council representative protesting the project. Residents active in opposing the gates later formed CAGE. Many members of CAGE regularly use the public streets and sidewalks inside the proposed gated area for such purposes as commuting to work and jogging.

In 1991, through counsel, respondents wrote letters to the City and the Association expressing their opposition to the project and requesting a hearing so that their objections could be heard. When this avenue proved unavailing, the instant lawsuit was filed.

II. *Procedural History*

On May 18, 1992, respondents filed their petition and complaint, naming the City and the Association as defendants. The complaint alleged that the Association was poised to begin operating the gates in a selective manner so as to exclude members of the public from public streets in violation of the Vehicle Code.

The complaint requested: (1) a writ of mandate ordering the City to terminate the authorization it had given the Association to operate the gates; (2) an injunction requiring the gates to be removed; and (3) declaratory relief in the form of an order stating that the City violated the Vehicle Code in authorizing the gates.

On October 9, 1992, respondents moved for summary adjudication of all issues other than the affirmative defenses asserted in defendants' answers to the complaint, arguing that the gates were prohibited by sections 21101.6 and 21.

The City and the Association filed motions for summary judgment in November 1992 on the questions of the City's duty under the Vehicle Code and laches. The question of laches was later withdrawn.

The court granted respondents' motion for summary adjudication and denied defendants' motions for summary judgment. After a trial on the laches issue, the court issued a final judgment in favor of respondents.

The court found that section 21101.6 prohibits the City from exercising its power to withdraw a street from public use to allow homeowners to construct gates, entered judgment in favor of respondents, ordered termination of the Agreement, revocation of the permit and removal of the gates.

The Association filed a timely notice of appeal.

### DISCUSSION

In its statement of decision, the court stated that the City's act of authorizing appellant to erect and operate the gates violated sections 21101.6 and 21[2] as well as the common law rights of members of the public to use dedicated public streets and highways. We independently review the trial

---

[2]Section 21 provides: "Except as otherwise expressly provided, the provisions of this code are applicable and uniform throughout the State and in all counties and municipalities therein,

court's determinations of questions of law. (*Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721].)

Section 21101.6 provides: "Notwithstanding Section 21101, local authorities may not place gates or other selective devices on any street which deny or restrict the access of certain members of the public to the street, while permitting others unrestricted access to the street. [¶] This section is not intended to make a change in the existing law, but is intended to codify the decision of the Court of Appeal in City of Lafayette v. County of Contra Costa (91 Cal.App.3d 749) [154 Cal.Rptr. 374]."

 Appellant contends that section 21101.6 does not apply because that section is directed at local authorities and appellant installed the gates here, the streets of Whitley Heights are not streets under the Vehicle Code as they are not open to public use, and *City of Lafayette* v. *County of Contra Costa* (1979) 91 Cal.App.3d 749 [154 Cal.Rptr. 374] dealt with the partial closure of public streets to members of the public while the closure here is total and resident access is not as members of the public but as private owners.

In *City of Lafayette* v. *County of Contra Costa, supra*, 91 Cal.App.3d 749, the city voted to close Happy Valley Road (by way of an automatic gate) to through traffic except for drivers with an established need. The city sought a judicial declaration that it had the right to close the road and that it was entitled to do so by the installation of an automatic gate. The court held that the entire area covered by the Vehicle Code had been preempted by state law and that in the absence of express legislative authority, the city had no authority to restrict the right to travel on one of its streets. (*Id.*, at pp. 754-757.)

A. *Public Right to Use Streets*

The *Lafayette* court noted that: " 'The streets of a city belong to the people of the state, and every citizen of the state has a right to the use thereof, subject to legislative control. . . . The right of control over street traffic is an exercise of a part of the sovereign power of the state. . . . While it is true that the regulation of traffic upon a public street is of special interest to the people of a municipality, it does not follow that such regulation is a municipal affair, and if there is a doubt as to whether or not such regulation is a municipal affair, that doubt must be resolved in favor of the legislative

---

and no local authority shall enact or enforce any ordinance on the matters covered by this code unless expressly authorized herein."

authority of the state.' " (*City of Lafayette* v. *County of Contra Costa, supra,* 91 Cal.App.3d at p. 753.)

The court also reasoned that: " 'Fundamentally it must be recognized that in this country "Highways are for the use of the traveling public, and all have . . . the right to use them in a reasonable and proper manner, and subject to proper regulations as to the manner of use." . . . "The streets of a city belong to the people of the state, and the use thereof is an inalienable right of every citizen, subject to legislative control or such reasonable regulations as to the traffic thereon or the manner of using them as the legislature may deem wise or proper to adopt and impose." . . . "Streets and highways are established and maintained primarily for purposes of travel and transportation by the public, and uses incidental thereto. Such travel may be for either business or pleasure . . . The use of highways for purposes of travel and transportation is not a mere privilege, but a common and fundamental right, of which the public and individuals cannot rightfully be deprived . . . [A]ll persons have an equal right to use them for purposes of travel by proper means, and with due regard for the corresponding rights of others".' " (*City of Lafayette* v. *County of Contra Costa, supra,* 91 Cal.App.3d at p. 753.)

### B. *Partial v. Total Closure*

Appellant contends that *Lafayette* (and thus section 21101.6) is not applicable because they only apply to partial closures of a street while the closure here was total[3] in that the City withdrew the streets from public use pursuant to Government Code sections 37359 and 37361. In addition, appellant argues that *Lafayette* involved discrimination between groups with the same public right of access while here any access to the streets by the residents was a private, not public, right.

As noted by the Supreme Court, the court in *Lafayette* ordered the "removal of the barrier because the city had no authority partially to close the street, not because closure discriminated between residents and nonresidents." (*Rumford* v. *City of Berkeley* (1982) 31 Cal.3d 545, 554, fn. 7 [183 Cal.Rptr. 73, 645 P.2d 124].) In *Rumford,* the court determined that although the Vehicle Code permitted local authorities to close streets no longer needed for vehicular traffic, it did not expressly permit a city to close a street to through traffic while allowing its use for neighborhood purposes. (*Id.,* at p. 551.)

---

[3]Although *Lafayette* distinguished cases allowing for total closure, those cases involved total closure after a finding that the street was no longer needed for vehicular traffic. (*City of Lafayette* v. *County of Contra Costa, supra,* 91 Cal.App.3d 749, 757.)

As in *Lafayette*, the court looked to the preemption of the entire field of traffic control by the state and concluded that the restricted nature of the delegation of power to prescribe traffic rules meant that a city had only power expressly provided for in the Vehicle Code. (*Rumford* v. *City of Berkeley, supra*, at pp. 549-550.)

In essence, appellant tries to avoid the effect of *Lafayette* and *Rumford* by claiming that the streets in Whitley Heights were totally withdrawn from public use, i.e., they were not public streets, and that access by the residents would be a matter of private right as owners of property abutting a public road retain a private right of access. (*Harman* v. *City and County of San Francisco* (1972) 7 Cal.3d 150, 167 [101 Cal.Rptr. 880, 496 P.2d 1248].) In *Lafayette* and *Rumford*, there had been no attempt to change the public nature of the streets nor any claim that access was other than as a member of the public.

The Agreement provides that the "withdrawal from public use is not a vacation or abandonment of the street or of the City ownership thereof nor a permanent withdrawal."

The City was well advised not to call the withdrawal order a vacation or abandonment. ■ "A street may not be vacated for exclusive private use." (*Constantine* v. *City of Sunnyvale* (1949) 91 Cal.App.2d 278, 282 [204 P.2d 922].) To abandon a public road, the City must find that it is no longer necessary, i.e., there is no present or future use for the road, and that the abandonment is in the public interest.[4] (Sts. & Hy. Code, § 959; *Heist* v. *County of Colusa* (1984) 163 Cal.App.3d 841, 848-849 [213 Cal.Rptr. 278].)

■ As noted by the Attorney General: "Regulating the use of the public roads and highways by whatever means is outside the 'municipal affairs' constitutional grant of authority to chartered cities." (68 Ops.Cal.Atty.Gen. 101, 102, fn. 2 (1985).) Moreover, citing section 21, *Rumford*, and *Lafayette*, among others, the Attorney General stated: "Since the state has preempted the entire field of traffic control, any right of a local authority to interfere with the free flow of traffic, *as by closing a street*, must be derived from an express delegation of authority from the Legislature." (Italics added.) (75 Ops.Cal.Atty.Gen. 80, 81 (1992).) We agree.

In *Pinewood Investors* v. *City of Oxnard* (1982) 133 Cal.App.3d 1030, 1040 [184 Cal.Rptr. 417], the court reasoned that the constitutional delegation of police power "does not enable a municipality to ignore a specific

---

[4]In a letter generated by the Association's request for closure, the city attorney mentions the need for such findings and seems to imply possible difficulties regarding the future use finding.

governing statute dealing with a particular subject." Closing of streets, as opposed to vacation/abandonment, is also addressed by specific provisions of the Vehicle Code.

 The Vehicle Code permits local authorities to close "any highway[5] to vehicular traffic when, in the opinion of the legislative body having jurisdiction, the street is no longer needed for vehicular traffic." (§ 21101, subd. (a).) Thus, a city is expressly authorized by the Vehicle Code to close streets no longer needed for vehicular traffic. However, cities are not expressly authorized to close streets for any other purpose.[6]

 Under the Agreement, the effect of the withdrawal of the public streets was to close them to public use without a determination that the streets were no longer needed for vehicular traffic. (Appellant refers to the total closure of the streets in its briefs.) Accordingly, we conclude that the City did not have any express statutory authority to withdraw the streets from public use.

Appellant argues that the court's decision usurps a city's power to withdraw streets from public use. A city can withdraw streets from public use pursuant to section 21101, subdivision (a). Appellant further argues that the decision takes away a city's power to vacate or abandon streets. A city still can vacate or abandon a street upon a finding that the property in question is unnecessary for present or future uses as a street. (See Sts. & Hy. Code, §§ 8300-8363 & 955-960.5.) What the City cannot do is wave the magic wand and declare a public street not to be a public street.

## C. *The Status of the Streets as Public*

In relevant part, section 590 defines a "street" as one "publicly maintained and open to the use of the public." By withdrawing the streets from public use the City has attempted to defeat the second part of that definition. Other provisions in the Agreement negate any argument that the streets are now private streets.

The Agreement provides: "City of Los Angeles will continue to be obligated to provide for the structural maintenance of the roadways and curbs of the *public streets* within the Whitley Heights neighborhood, including but not limited to correcting subsidence problems, filling cracks, repairing broken curbs, and otherwise repairing defective or deteriorated conditions. The Association shall be responsible for street sweeping or washing

---

[5]"For our purposes, 'street' and 'highway' are synonymous terms in the Vehicle Code. (§§ 360, 590.)" (*Rumford* v. *City of Berkeley, supra,* 31 Cal.3d 545, 550, fn. 5.)

[6]In 1992, the Vehicle Code was amended to add section 21101.4 which permits temporary closing of streets due to criminal activity after certain determinations have been made.

and trimming of street trees. [¶] City will continue to provide all services related to sewers, storm drains, street lights, and the maintenance of the improvements connected with such functions." (Italics added.)

It further provides that certain undefined maintenance obligations will be taken over by appellant when the streets reach "first class condition." However, the Agreement provides that the obligation would have to be specified in a "subsequent agreement." The Whitley Heights streets are presently cracked and seriously deteriorated. Thus, under the Agreement, it is clear that public funds will continue to be spent to maintain the streets until some unspecified future time when they are in first class condition.

Appellant acknowledged that the costs of street maintenance are substantial. Indeed, it was the existence of the ongoing maintenance costs that prompted appellant, when it first considered the gates, to look for an alternative to the traditional method of street vacation—a method that requires the private owners of the vacated streets to pay for all of the maintenance and related services.

Moreover, under the Agreement, the City remains liable for injuries caused by any dangerous condition on the streets and sidewalks of Whitley Heights. The Agreement requires appellant to purchase a liability policy naming the City as an insured for damage claims arising from the placement of the gates themselves. However, the policy does not relieve the City of liability for damages caused by dangerous conditions on the surface of the streets or for any damage in excess of the coverage limits.

### D. *Government Code Sections*

In relevant part, Government Code section 37359 provides: "Unless otherwise provided by law, the legislative body having control of any property owned or controlled by the city may at any time withdraw the property from the personal access and use of members of the public, or limit the access or use in area or time or in any other reasonable manner deemed necessary."

As closure of public streets is a regulation of vehicular traffic, it falls into the area preempted by the Vehicle Code. Appellant argues Government Code section 37359 authorizes the City to close streets because in *Irwin* v. *City of Manhattan Beach* (1966) 65 Cal.2d 13 [51 Cal.Rptr. 881, 415 P.2d 769], the court applied that section to public streets. In *Irwin*, the court held that a pedestrian overpass constructed over a street could be withdrawn from public access. (*Id.*, at p. 22.) Withdrawal of a pedestrian overpass is not equivalent to the withdrawal of a public street and is not a regulation of vehicular traffic.

According to appellant, under the Agreement, the City could maintain the streets pursuant to Streets and Highways Code section 1920. To the extent that appellant is suggesting that section allows a city to expend public funds to maintain a private street, the section merely authorizes a city to set forth minimum maintenance requirements for a street removed from public use or closed to traffic and says nothing about the expenditure of public funds to maintain private streets.[7]

If the streets are still "public," it makes no sense to classify them as public when it comes to the expenditure of public funds, but classify them as private when it comes to public use. Appellant cannot have it both ways.

Government Code section 37361 provides: "The legislative body may acquire property for the preservation or development of a historical land-mark. It may also acquire property for the development of recreational purposes and facilities in connection therewith. [¶] The legislative body may provide for places, buildings, structures, works of art, and other objects, having a special character or special historical or aesthetic interest or value, special conditions or regulations for their protection, enhancement, perpetuation or use, which may include appropriate and reasonable control of the use or appearance of neighboring private property within public view or both."

Citing *Bohannan* v. *City of San Diego* (1973) 30 Cal.App.3d 416 [106 Cal.Rptr. 333], appellant argues that the restrictions in the Agreement are protections that serve to enhance and perpetuate a historic place within the City. In *Bohannan*, the court upheld a city ordinance restricting the use of signs in a historic district because the signs served to maintain the historic atmosphere. (*Id.*, at pp. 422-423.) Again, sign regulation is not a preempted regulation of vehicular traffic.

There is no fundamental public interest in pedestrian overpasses or sign regulation as there is in the use of streets. Despite characterizing the streets of Whitley Heights as withdrawn, the effect of the Agreement was to partially close the streets so that residents would be allowed to use the streets while nonresidents would not. Thus, the situation in this case is exactly the same as *Rumford* and works a partial closure. We conclude that section 21101.6 is therefore applicable and prohibits gating the area.

Furthermore, as the streets are still public, it does not matter that the gates were erected by appellant rather than the City; they were erected via City

---

[7]Besides an obligation to maintain the streets, the Agreement states that the City will continue to provide services related to the streets, e.g., sewers, storm drains. Neither party discusses whether the City may provide such services to private streets.

authorization. Appellant cannot erect gates on public streets. (See § 21465; Civ. Code, § 3479.)

Even though Whitley Heights is arguably in a discrete and isolated area of the City, under appellant's reasoning, there is nothing which would prevent the City from applying this alleged power to withdraw streets from public use in other areas of the City. Although we understand the deep and abiding concern of the City and appellant with crime prevention and historic preservation, we doubt the Legislature wants to permit a return to feudal times with each suburb being a fiefdom to which other citizens of the state are denied their fundamental right of access to use public streets within those areas.[8] If such action is necessary, then it should be expressly authorized by the Legislature along with whatever safeguards it deems necessary to protect the public interest in public streets.

### DISPOSITION

The judgment is affirmed. Respondents to recover costs on appeal.

Lillie, P. J., and Johnson, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 2, 1994.

---

[8]Our concern is supported by references in the amicus curiae brief that, as of January 1993, the City had over 100 pending applications for street closures.