[Nos. A118244, A118723. First Dist., Div. Two. Aug. 11, 2008.]

ZACK'S, INC., Plaintiff and Appellant, v.
CITY OF SAUSALITO et al., Defendants and Respondents.

## Counsel

Seiler Epstein Ziegler & Applegate and Douglas Allen Applegate for Plaintiff and Appellant.

Lepper & Harrington, Gary M. Lepper, Paul V. Samoni and Jennifer Rebecca Beierle for Defendant and Respondent City of Sausalito.

Edmund G. Brown, Jr., Attorney General, J. Matthew Rodriguez, Assistant Attorney General, and Alice Busching Reynolds, Deputy Attorney General, for Defendants and Respondents The State of California, State Lands Commission and Paul D. Thayer.

Keegin Harrison Schoppert Smith & Karner and Paul C. Smith for Defendant and Respondent Edgewater Yacht Sales.

## Opinion

**KLINE, P. J.**—The questions this case poses are (1) whether a city can lawfully lease a portion of a dedicated public street to a private party for a commercial purpose, thereby impairing private and public easements therein, where the street is situated on tidelands granted the city by the Legislature and held by it pursuant to the common law public trust relating to tidelands and submerged lands and, if so, (2) whether the power granted the city by the Legislature permits it to vacate or close the leased portion of the street without complying with general statutes applicable to the vacating or closing of public streets.

Appellant, Zack's, Inc. (Zack's), commenced this action against the City of Sausalito (City), the State of California, the California State Lands Commission, Paul D. Thayer, Executive Officer of the State Lands Commission (hereafter collectively the state or state respondents), and Edgewater Yacht Sales (Edgewater), claiming that the storage of boats and equipment by Edgewater on a leased portion of a street upon which Zack's property abuts constitutes a nuisance per se. Zack's complaint also included causes of action to quiet its title to easements of ingress and egress to the street and for an adjudication that a statute transferring title to the tidelands at issue to City pursuant to the public trust does not authorize City to lease a portion of the street for a use that interferes with private and public easements in the street. The cause of action for nuisance is only against City and Edgewater; the two remaining causes of action are against all respondents.

City and state respondents separately moved for summary judgment and Edgewater joined in City's motion. The motions were both granted on the ground that Zack's claims are all barred by applicable statutes of limitation. Judgment in favor of City and state respondents was entered on that basis, as was a subsequent separate judgment in favor of Edgewater.

We shall reverse the judgments.

### FACTS AND PROCEEDINGS BELOW

Zack's owns property improved with a large "warehouse style building" at the corner of Locust Street and Humboldt Avenue in the City. The north side of the property abuts on Locust Street, which travels easterly and westerly, and the west side abuts on Humboldt Avenue, which runs northerly and southerly. Approximately halfway between Locust Street and Turney Street, the next parallel street to the south, Humboldt Avenue terminates at the edge of Richardson Bay, a body of water within San Francisco Bay. The south and east sides of Zack's property are bounded and apparently partially submerged

by Richardson Bay. In 1979, City leased to Edgewater month to month, a portion of Humboldt Avenue contiguous to Zack's property and to the waters of Richardson Bay that abut the end of the street, for use "only for the storage of boats in the water premises and storage of boats on trailers in the land premises."[1] As we later explain, Zack's property and the streets it abuts are on reclaimed tidelands originally held by the state in trust for the public purposes of navigation, commerce, and fishery. In 1957, the Legislature enacted an uncodified statute transferring to City, upon express conditions, the state's right, title, and interest in the submerged land and tideland over and upon which the leased premises are located, and also transferring to City the state's responsibilities as trustee of said lands. (Stats. 1957, ch. 791, § 2, pp. 2002–2004 (hereafter the 1957 statute).)

Because Zack's had access to its warehouse from Locust Avenue, Edgewater's leasehold did not significantly interfere with its use of its property until 1999. That year, Zack's commenced efforts to develop the property by converting the warehouse into a restaurant. This effort has allegedly been frustrated by the fact that use of the leasehold for the storage of boats eliminated parking, blocked easy access to Zack's building, and obstructed visibility of the building from City's main thoroughfare, a block away. For these reasons, Zack's claims it was unable to interest prospective operators of its proposed restaurant.

On March 7, 2005, after City had rejected development proposals that would have eliminated Edgewater's boat storage facility, Zack's commenced this action by filing a complaint for nuisance and inverse condemnation. Five months later, Zack's moved for summary adjudication, claiming undisputed material facts entitled it to judgment as a matter of law on its nuisance claim. The ground of the motion was that City had no lawful basis upon which to grant a leasehold in a public street, and obstruction of the street by the leasehold therefore constituted a nuisance per se. City opposed the motion by simultaneously filing a cross-motion for summary judgment or, in the alternative, summary adjudication. Resting on the proposition that "[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance" (Civ. Code, § 3482), City asserted that the 1957 statute provided it "express[] authorit[y]" to lease a portion of that tidewater street for commercial use as a boat storage facility. The trial court agreed. Finding that the 1957 statute "necessarily" conferred the requisite authority to lease Humboldt Avenue to a private party for purposes of boat storage, the court concluded that "the reasonable use of the street for this purpose cannot be a nuisance as a matter of law," and City had a complete defense to the cause of

---

[1] Edgewater acknowledged in the lease its awareness of Public Resources Code sections 6701–6706, which relate to the leasing of public lands, and agreed to bear all costs of any proceedings necessary to protect any interests it may have that are protected by those statutes.

action for nuisance. Accordingly, the court denied Zack's motion for summary adjudication and granted that of City.

Thereafter, on April 11, 2006, the court granted Zack's leave to amend its complaint not only by adding causes of action for quiet title and declaratory relief and to add state respondents as defendants to those causes of action,[2] but also by amending its nuisance claim. With respect to the nuisance claim, Zack's proposed to add a paragraph stating that "[w]hether by reason of the proper interpretation of [the 1957 statute] or by virtue of the invalidity of [that statute], the use of Humboldt Avenue for private purposes is not a use specifically authorized by the California Legislature." City objected to this additional language on the ground that it asserts a claim the court had previously rejected. Agreeing with City that this legal question had been resolved, the court barred Zack's from adding the new language to its nuisance claim. The proposed new language was, however, surplusage, because the remaining portion of the "amended" cause of action for nuisance, which the court allowed, is *identical* to that of the original cause of action summarily adjudicated in favor of City; both state: "The private commercial use of a public street is a nuisance per se under California Civil Code section 3479" and " 'a municipality has no power to authorize the use of streets for a private purpose.' "

The court allowed the "amendment" reiterating this "new" nuisance cause of action and those for quiet title and declaratory relief on the ground that "[t]hese new causes of action, for the first time, challenge the <u>manner</u> in which the City of Sausalito exercised its statutory authority to lease to defendant Edgewater Yacht Sales, the right to use the street for boat storage." The court's ruling and explanation are puzzling.

The *only* "manner" in which Zack's has ever claimed Edgewater's leasehold constitutes a nuisance per se is that it "unlawfully obstructs the free passage or use, in the customary manner, of any . . . street," and the *only* lawful basis for the challenged use of Humboldt Avenue that City has ever offered in response to the claim was (and remains) the 1957 statute. Nor do Zack's quiet title and declaratory relief claims relate in any way to the "manner" in which City exercised its leasing authority; the gravamen of both is simply that City lacks statutory authority to lease Humboldt Avenue to a private party. The court's allowance of the amendment therefore cannot be reconciled with its earlier denial of Zack's motion for summary adjudication

---

[2] After they were made parties, state respondents demurred to the cause of action for inverse condemnation, and the trial court sustained the demurrer without leave to amend. Zack's does not challenge that ruling on this appeal. Therefore, the only causes of action here at issue are those for nuisance, which is only against respondents City and Edgewater Yacht Sales, and quiet title and declaratory relief, which are only against City and state respondents.

on the ground that the 1957 statute "necessarily" conferred on City the requisite authority to lease Humboldt Avenue to a private party for purposes of boat storage, and therefore "the reasonable use of the street for this purpose cannot be a nuisance as a matter of law," and City had a "complete defense" to the cause of action for nuisance.

In November 2006, City and state respondents moved for summary judgment on the ground that the Edgewater leasehold is authorized by the 1957 statute and any rights Zack's may have in Humboldt Avenue are subservient to those of City and have been extinguished by adverse use. Zack's was not entitled to relief under any of its causes of action, the state maintained, because use of Humboldt Avenue for a boat storage facility was authorized under the 1957 statute. On March 1, 2007, the court issued an order granting City's and state respondents' motions for summary judgment on the ground that all of Zack's claims against City "are barred by the statutes of limitation" (citing Code Civ. Proc., §§ 318, 319, 338, subd. (j)). The court reasoned that Zack's claims "accrued, at the latest, when [it] bought [the] property in 1998, and thereby incurred an 'actual' impairment to its easement interests from defendant Edgewater's existing use of the disputed portion of Humboldt Avenue. The direct cause of the harm was apparent and 'stabilized' when [Zack's] bought its property." Because the statutes of limitations cited by the court relate to actions other than ones to abate a public nuisance and "[n]o lapse of time can legalize a public nuisance" (Civ. Code, § 3490), the court's ruling necessarily implies a determination that the leasehold was not a public nuisance because it was authorized by the 1957 statute.

Although the trial court did not explicitly address the issue, its ruling also necessarily rejected an important subsidiary claim advanced by Zack's in opposition to summary judgment. Zack's argued that even if the 1957 statute authorized the leasehold, it did not relieve City of the need to comply with general statutes governing the vacating or closure of a portion of a public street, which was the effect of the lease. Zack's claimed the 1957 statute does not exempt City from those general statutes, and City's failure to comply with them voids the leasehold (see County of San Diego v. Cal. Water etc. Co. (1947) 30 Cal.2d 817, 824 [186 P.2d 124]) and deprives City of the defense that the lease is statutorily authorized and the leasehold therefore cannot give rise to nuisance liability.

Notice of entry of judgment based on the court's rulings was filed on April 23, 2007.[3]

---

[3] The trial court thereafter entered a separate judgment in favor of respondent Edgewater Yacht Sales. Subsequently we granted Zack's motion to consolidate the separate appeals from the two judgments.

## DISCUSSION

### I.

Our review of a judgment based upon a grant of summary judgment is de novo. As in the trial court, the moving party's papers are strictly construed and the opposing party's are liberally construed. All doubts as to the propriety of granting the motion—i.e., whether there is any issue of triable fact—are to be resolved in favor of the party opposing the motion. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768–769 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) We independently determine the construction and effect of the facts presented to the trial judge as a matter of law. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517]; *Saldana v. Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1511–1515 [285 Cal.Rptr. 385].)

The grant of summary judgment is based upon the trial court's determinations that (1) the leasehold City granted Edgewater was expressly authorized by the 1957 statute; and (2) that statute relieved City of the need to comply with general statutes relating to street closure. Both of these determinations present pure issues of law as to which our review is de novo.

### II.

Zack's assertion that City's lease impairs its private easement in Humboldt Avenue assumes that that thoroughfare is, to use the appellation Zack's favors, a "real street." Respondents, loath to allow that the land at issue is the same as any other street, variously refer to it in their briefs as "the leased property" or "the boat storage area." The importance the parties attach to the characterization of Humboldt Avenue arises out of the fact that the land upon which it sits is reclaimed tidelands held by City in trust for the benefit of the public pursuant to the 1957 statute. Therefore, before turning to the scope and effect of the 1957 statute, it is necessary to briefly explain the common law public trust relating to tidelands and submerged lands.

In 1850, when California was admitted to the Union, it acquired ownership of all tidelands and the beds of all inland navigable waters within its borders. (*Phillips Petroleum Co. v. Mississippi* (1988) 484 U.S. 469, 473–474 [98 L.Ed.2d 877, 108 S.Ct. 791]; *Shively v. Bowlby* (1894) 152 U.S. 1, 53–54 [38 L.Ed. 331, 14 S.Ct. 548]; *City of Berkeley v. Superior Court*

(1980) 26 Cal.3d 515, 521 [162 Cal.Rptr. 327, 606 P.2d 362]; see also Civ. Code, § 670.) Such tidelands and submerged lands[4] "belong to the state in its sovereign character and are held in trust for the public purposes of navigation and fishery. A public easement and servitude exists over these lands for those purposes. . . . 'The control of the state for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.' " (*People v. California Fish Co.* (1913) 166 Cal. 576, 584 [138 P. 79]; *Illinois Central Railroad v. Illinois* (1892) 146 U.S. 387, 452–453 [36 L.Ed. 1018, 13 S.Ct. 110] (*Illinois Central*).) " 'The right of the state is subservient to the public rights of navigation and fishery, and theoretically, at least, the state can make no disposition of them prejudicial to the right of the public to use them for the purposes of navigation and fishery, and whatever disposition she does make of them her grantee takes them upon the same terms upon which she holds them, and, of course, subject to the public rights above mentioned.' [Citations.]" (*People v. California Fish Co.*, at p. 584, quoting *Ward v. Mulford* (1867) 32 Cal. 365, 372.)

The public trust doctrine, which is traceable to Roman law,[5] rests on several related concepts. First, that the public rights of commerce, navigation, fishery, and recreation are so intrinsically important and vital to free citizens that their unfettered availability to all is essential in a democratic society.

---

[4] "The term 'tidelands' is often used generically to cover all the state trust lands in and fronting on the ocean or the bay; but in California, where statutes distinguished various kinds of lands for purposes of disposition, it is useful to separate submerged lands—which are those always covered by water, even at low tide—from tidelands—those covered and uncovered by daily tides, that is, the lands lying between mean high-tide and mean low-tide—and from swamp and overflowed lands—those which are above mean high-tide, but subject to extreme high tides so that marsh grasses grow on them; they are commonly called marshlands." (Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention* (1970) 68 Mich. L.Rev. 471, 525, fn. 159 (hereafter *The Public Trust Doctrine*).)

[5] Book II, title I, sections 1 through 5 of the Institutes of Justinian declare that: "§ 1. Things common to mankind by the law of nature, are the air, running water, the sea, and consequently the shores of the sea; no man therefore is prohibited from approaching any part of the seashore, whilst he abstains from damaging farms, monuments, edifices, &c. which are not in common as the sea is. [¶] § 2. Rivers and ports are public; hence the right of fishing in a port, or in rivers are in common. [¶] § 3. All that tract of land, over which the greatest winter flood extends itself, is the sea-shore. [¶] § 4. By the law of nations the use of the banks is as public as the rivers; therefore all persons are at equal liberty to land their vessels, unload them, and to fasten ropes to trees upon the banks, as to navigate upon the river itself; still, the banks of a river are the property of those who possess the land adjoining; and therefore the trees which grow upon them, are also the property of the same persons. [¶] § 5. The use of the sea-shore, as well as of the sea, is also public by the law of nations; and therefore any person may erect a cottage upon it, to which he may resort to dry his nets, and hawl them from the water; for the

(*Martin et al. v. Waddell* (1842) 41 U.S. (16 Pet.) 367, 413–414 [10 L.Ed. 997].) "An allied principle holds that certain interests are so particularly the gifts of nature's bounty that they ought to be reserved for the whole of the populace. . . . [¶] Finally, there is often a recognition, albeit one that has been irregularly perceived in legal doctrine, that certain uses have a peculiarly public nature that makes their adaptation to private use inappropriate. The best known example is found in the rule of water law that one does not own a property right in water in the same way he owns his watch or his shoes, but that he owns only an usufruct—an interest that incorporates the needs of others. It is thus thought to be incumbent upon the government to regulate water uses for the general benefit of the community and to take account thereby of the public nature and the interdependency which the physical quality of the resource implies." (Sax, *The Public Trust Doctrine, supra,* 68 Mich. L.Rev. at pp. 484–485.)

■ The obligations a government may have as tidelands trustee are more complex and demanding than its general obligation to act for the public benefit. Where, as here, the propriety of a governmental reallocation of trust land from one public use to another is placed in question, the seminal opinion in *Illinois Central, supra,* 146 U.S. 387, makes clear that courts should "look with considerable skepticism upon *any* governmental conduct which is calculated *either* to reallocate that resource to more restricted uses *or* to subject public uses to the self-interest of private parties." (Sax, *The Public Trust Doctrine, supra,* 68 Mich. L.Rev. at p. 490.) Trust lands may be devoted to purposes unrelated to the trust if such purposes are incidental to and accommodate trust uses but, as *Illinois Central* shows, there are limits on the legislative authority to free use of trust land for nontrust purposes.

---

shores are not understood to be property in any man, but are compared to the sea itself, and to the sand or ground which is under the sea." (Cooper, The Institutes of Justinian (3d ed. 1852) bk. II, tit. I, §§ 1–5, pp. 67–68.)

Justinian's rules found their way into French law and in that way also into the law of the State of Louisiana, where they were codified and remain vital. (See, e.g., *Gulf Oil Corporation v. State Mineral Board* (La. 1975) 317 So.2d 576, 581–582.)

The same principles were in the 13th century incorporated by Alfonso X of Castile into *Las Siete Partidas* (see *Las Siete Partidas* (Scott transl. 1932) at 3.28.6 ["[e]very man has a right to use the rivers for commerce and fisheries, to tie up to the banks, and to land cargo and fish on them"]), and entered California through Spanish and Mexican law. The Supreme Court has suggested that these principles, which were guaranteed by the Treaty of Guadalupe Hidalgo, provide an independent basis for public access to navigable waters. (Stevens, *The Public Trust: A Sovereign's Ancient Prerogative Becomes the People's Environmental Right* (1980) 14 U.C. Davis L.Rev. 195, 197, citing *Knight v. U. S. Land Association* (1891) 142 U.S. 161, 183–187 [35 L.Ed. 974, 12 S.Ct. 258]; *San Francisco v. Le Roy* (1891) 138 U.S. 656, 670–672 [34 L.Ed. 1096, 11 S.Ct. 364].)

The trust powers of the state "may for a limited period be delegated to a municipality or other body, but there always remains with the [s]tate the right to revoke those powers and exercise them in a more direct manner, and one more comfortable to its wishes." (*Illinois Central, supra*, 146 U.S. at pp. 453–454.) With exceptions not here pertinent, the public trust continues to apply to tidelands even if, as is the case with respect to the portion of Humboldt Avenue with which we are concerned, the lands are no longer submerged due to the placement of fill. (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 479 [91 Cal.Rptr. 23, 476 P.2d 423].)

Soon after California became a state, and despite limitations imposed by the public trust doctrine upon the alienation of tidelands to private parties, the Legislature began to sell into private ownership vast tracts of tidelands, many of which transfers were fraudulently made.[6] (*City of Berkeley v. Superior Court, supra*, 26 Cal.3d at pp. 521, 522–523.) In 1868, as part of an effort to raise revenues,[7] the Legislature created the State Board of Tide Land Commissioners and directed it "to take possession of marshland, tideland and submerged land in the City of San Francisco, to establish a waterfront line for the city, and to sell lots within that line, reserving parcels for certain purposes. (Stats. 1867–1868, ch. 543, §§ 1, 4, 5, pp. 716–720.)" (*City of Berkeley v. Superior Court*, at pp. 522–523.) A supplementary act in 1870 directed the board to survey and subdivide waters of San Francisco Bay including those of Richardson Bay within Marin County. (Stats. 1869–1870, ch. 388, §§ 1, 2, 3, pp. 541–542.) The survey and subdivision of tidelands and submerged lands of Richardson Bay commissioned by the board resulted in the creation of lots separated by designated streets. Portions of most of the lots and streets created were subsequently raised by the placement of fill and are no longer completely submerged or wholly subject to tidal action. One such lot is that now owned and occupied by Zack's, which in 1871 was sold by the state to one John Turney, Zack's predecessor in interest, for $250. Humboldt Avenue is among the streets designated by the 1870 subdivision, and the designation constitutes a dedication of the land upon which it sits to

---

[6] "The widespread abuses in the disposition of tidelands led to the adoption in 1879 of article XV, sections 2 and 3 of the Constitution (now art. X, §§ 3 & 4). These provisions prohibit the sale to private persons of tidelands within two miles of an incorporated city, and state that no individual may obstruct the free navigation of tidelands on navigable waters nor the right of way to such waters, when required for a public purpose." (*City of Berkeley v. Superior Court, supra*, 26 Cal.3d at p. 523.) In 1980, our Supreme Court noted that "[a]s a result of these open-handed policies, today almost one-quarter of the [San Francisco] Bay is claimed by private persons. Of the remainder, approximately one-quarter has been granted by the state to cities and counties, the state owns about one-half, and the federal government 5 percent. [Citation.]" (*Ibid.*) (Other historic abuses of the tideland trust in California are described in Note, *California's Tideland Trust: Shoring It Up* (1971) 22 Hastings L.J. 759, 763–765.)

[7] See Comment, *The Tideland Trust: Economic Currents in a Traditional Legal Doctrine* (1974) 21 UCLA L.Rev. 826, 832–836.

use as a public street regardless whether City ever formally accepted that dedication. (*Arques v. City of Sausalito* (1954) 126 Cal.App.2d 403, 406 [272 P.2d 58].)

In 1938, the Legislature created respondent State Lands Commission and transferred to it authority over lands and waters previously within the possession or jurisdiction of the Board of Tide Land Commissioners. The State Lands Commission, which has "exclusive jurisdiction over all un-granted tidelands and submerged lands owned by the State," and "exclusively administer[s] and control[s] all such lands, and may lease or otherwise dispose of such lands . . . ." (Pub. Resources Code, § 6301), retained control over Humboldt Avenue until the land upon which it is situated was conveyed to City by the 1957 statute.

### III.

■ "The administration of the trust by the state is committed to the Legislature, and a determination of that branch of government made within the scope of its powers is conclusive in the absence of clear evidence that its effect will be to impair the power of succeeding legislatures to administer the trust in a manner consistent with its broad purposes." (*City of Long Beach v. Mansell, supra,* 3 Cal.3d at p. 482, fn. 17.) With respect to the tidelands here at issue, the Legislature delegated the state's trust power to City by means of the 1957 statute.

■ The uncodified statute, set forth in its entirety in the appendix to this opinion, recites that City is granted "all of the right, title, and interest of the State of California, held by virtue of its sovereignty, in and to all tidelands and submerged lands of San Francisco Bay, whether filled or unfilled, situated and lying within the boundaries of the incorporated area of [the City of Sausalito], as such boundaries exist on the effective date of this act, to be forever held by said city, and its successors, in trust . . ." for specified uses and purposes and upon express conditions. (Stats. 1957, ch. 791, § 2, p. 2002.) The statute provides that the transferred lands "shall be used by said city . . . for the establishment, improvement and conduct of a harbor . . . , and for the construction, maintenance and operation thereon of wharves, docks, piers, slips, quays and other utilities, structures, facilities and appliances necessary or convenient for the promotion and accommodation of commerce and navigation by air as well as by water . . . ." (*Id.,* § 2, subd. (a), pp. 2002, 2003.) Although the statute declares that City "shall not at any time, grant, convey, give or alien said lands, or any part thereof, to any individual, firm or corporation for any purposes whatsoever" (and therefore conforms to what is now art. X, § 3 of the Cal. Const.), it expressly provides that City "may grant franchises thereon and *may lease said lands, or any part thereof, for limited*

*periods (but in no event exceeding 50 years), for purposes consistent with the trust upon which said lands are held by the State of California, and with the requirements of commerce and navigation at said harbor, and collect and retain rents from such leases, franchises and privileges.*" (Stats. 1957, ch. 791, § 2, subd. (a), pp. 2002, 2003, italics added.) Grants of waterfront lands similar in form and expression to the 1957 statute "have been interpreted repeatedly as conveyances to municipalities of tidelands subject to the public trust for navigation and commerce." (*Atwood v. Hammond* (1935) 4 Cal.2d 31, 37–38 [48 P.2d 20].)

■ Respondents maintain that the placement of a boat storage facility on Humboldt Avenue is consistent with the trust and authorized by the 1957 statute, and therefore cannot be deemed a nuisance, because the principle that " 'a municipality has no power to authorize the use of streets for a private purpose . . .' " (*Western States etc. Co. v. Bayside L. Co.* (1920) 182 Cal. 140, 144 [187 P. 735]) does not apply where " 'the power has been delegated by the legislature . . .' " (*ibid.*), and ■ "[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance." (Civ. Code, § 3482.) Courts have, however, "circumscribed the exculpatory effect of Civil Code section 3482. (*Varjabedian v. City of Madera* [(1977)] 20 Cal.3d 285, 291 [142 Cal.Rptr. 429, 572 P.2d 43].) The statutory immunity is available only where the acts complained of are authorized by the express terms of the statute or permit under which the justification is made, ' " '. . . or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the Legislature contemplated the doing of the very act which occasions the injury.' " ' [Citation.] Courts must scrutinize the statutes in question to ascertain whether a legislative intent exists to sanction a nuisance. (*Greater Westchester Homeowners Assn. v. City of Los Angeles* (1979) 26 Cal.3d 86, 102 [160 Cal.Rptr. 733, 603 P.2d 1329].)" (*Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1258 [54 Cal.Rptr.2d 340].)

## IV.

■ Boat storage facilities on reclaimed trust land or water are not among the authorized uses and purposes *expressly* identified by the 1957 statute, but we have little difficulty concluding that authority to operate such facilities on trust land, by City or its lessee, is necessarily implied. The statute authorizes use of the conveyed lands "for the establishment, improvement and conduct of a harbor." The chief function of a harbor is to shelter and otherwise accommodate boats or ships, which is among the purposes of the "wharves, docks, piers, slips, [and] quays" the statute refers to specifically. The statutory authorization is not limited to those five uses, however, and extends as well to "other utilities, structures, facilities and appliances necessary or convenient

for the promotion and accommodation of commerce and navigation by . . . water . . . ." Boat storage facilities on and off the water seem to us necessary, or at the very least convenient, for the promotion and accommodation of commerce and navigation on water at a harbor. As courts have observed, "[t]he public uses to which tidelands are subject are sufficiently flexible to encompass changing public needs. In administering the trust the state [or a successor trustee, such as City] is not burdened with an outmoded classification favoring one mode of utilization over another."[8] (*Marks v. Whitney* (1971) 6 Cal.3d 251, 259 [98 Cal.Rptr. 790, 491 P.2d 374]; see *Colberg, Inc. v. State of California ex rel. Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 421–422 [62 Cal.Rptr. 401, 432 P.2d 3].)

Zack's does not contest City's general power as trustee to reallocate tidelands from one use to another that also serves trust purposes. But it does claim City lacks power under either the trust or the 1957 statute to shift a strip of tidelands to another use after it has been dedicated as a public street and lots abutting the street have been sold on the basis of that dedication, as was Zack's property. This claim rests almost entirely on the opinion of the Ninth Circuit in *State of California v. United States* (9th Cir. 1948) 169 F.2d 914 (*State of California*).

---

[8] The flexibility in the uses to which tidelands may be put, and the fact that public trust uses may and often do conflict with one another, creates complexity. As the State Lands Commission has pointed out, "granted and ungranted lands already may have been developed for particular trust uses that are incompatible with other trust uses or may have become antiquated. Some tidelands have been dedicated exclusively to industrial port uses, for example, and in these areas, recreational uses, even if also authorized by the trust grant, may be incompatible. Similarly, tidelands set aside for public beaches may not be suitable for construction of a cannery, even though a cannery may be an acceptable trust use. Piers, wharves and warehouses that once served commercial navigation but no longer can serve modern container shipping may have to be removed or converted to a more productive trust use. Historic public trust uses may have been replaced by new technologies [and] . . . [a]ntiquated structures on the waterfront may be an impediment rather than a magnet for public access and use of the waters." (Cal. State Lands Com., The Public Trust Doctrine, p. 4, available at <http://www.slc.ca.gov/Policy_Statements/Public_Trust/Public_Trust_Doctrine.pdf> [as of Aug. 11, 2008].)

Development of tidelands for nonmaritime commercial purposes (see, e.g., *People v. City of Long Beach* (1959) 51 Cal.2d 875 [338 P.2d 177] [Y.M.C.A. for members of the armed services]; *Martin v. Smith* (1960) 184 Cal.App.2d 571 [7 Cal.Rptr. 725] [restaurant, bar, motel, swimming pool; shops and a parking area]; and *Haggerty v. City of Oakland* (1958) 161 Cal.App.2d 407 [326 P.2d 957] [hall for exhibitions, conventions and banquets]) thus increasingly conflict with the "growing public recognition that one of the most important public uses of the tidelands . . . is the preservation of those lands in their natural state, so that they may serve as ecological units for scientific study, as open space, and as environments which provide food and habitat for birds and marine life, and which favorably affect the scenery and climate of the area." (*Marks v. Whitney, supra,* 6 Cal.3d at pp. 259–260; see also Note, *California's Tideland Trust: Shoring It Up, supra,* 22 Hastings L.J. at pp. 771–773.)

*State of California, supra,* 169 F.2d 914, was a condemnation action against the state by the federal government, which took and condemned four parcels of unreclaimed land covered by the waters of San Francisco Bay needed for the expansion of facilities at the Naval Dry Docks in the Hunter's Point district of San Francisco. The district court awarded the state $1 for its interests in each parcel and the state appealed. Though the question nominally presented was " 'the proper valuation in a condemnation proceeding for tracts of land laid out as streets by the California Board of Tide Land Commissioners in 1869, which tracts were under 20 feet of water at the time of taking, in 1942' " (*id.* at p. 916), the court felt that the "real issue" was "whether or not, in law and in fact, the strips of land were actually streets at the date of the taking in condemnation." (*Id.* at p. 917.) The court found that the strips of land were at that time actually streets because they marked the boundaries of the lots created by the surveyor's map and were designated on that map as "streets," submerged lands are fully capable of being dedicated as streets, and the sale by the state of lots abutting and served by those streets constituted a complete dedication of such streets to the public. (*Id.* at p. 923.)

In the course of reaching this conclusion, the court found apt and quoted the following language in our opinion in *McGinn v. State Board of Harbor Commrs.* (1931) 113 Cal.App. 695 [299 P. 100] (*McGinn*), which related to a similar sale of tidelands by the state: " 'Having authorized the preparation of the map and having approved the map as filed with the streets, lanes, and other public places delineated thereon, the state stood in the same position as all owners of private property, and must therefore be deemed to have dedicated to public use all the public highways and places as delineated upon that map. Having immediately sold these lots in accordance with the map, *the state was without authority thereafter to withdraw from public use any of the streets shown upon the map.*' " (*State of California, supra,* 169 F.2d at p. 921, quoting *McGinn, supra,* 113 Cal.App. at p. 703, italics added.)

Zack's maintains that the pertinent facts of this case are materially indistinguishable from those of *State of California, supra,* 169 F.2d 914. The designation of Humboldt Avenue as a public street by the Board of Tide Land Commissioners in 1870 and the board's sale to private parties of lots delineated on the subdivision map as abutting Humboldt Avenue, including the 1871 sale of Zack's lot to Turney, its predecessor in interest, also constituted a dedication of Humboldt Avenue to public use as a street. Because this dedication could not be withdrawn by the state, Zack's maintains, neither can it be withdrawn by City, because the 1957 statute conferred on City no greater rights than the state possessed at the time of the transfer. *State of California* does not support this argument.

The language in the opinion Zack's relies upon does not say or even imply that the state lacked authority to ever withdraw the dedication of the

strips of land at issue to use *as streets*, but only that it lacked authority to withdraw such land from *public use* (*State of California, supra*, 169 F.2d at p. 921), which was relevant to the question of its present value. Indeed, in language Zack's ignores, which defers to pertinent California case law, the Ninth Circuit acknowledged that " 'where legislative authority exists, it is not to be questioned that [dedicated] streets themselves may be converted into public wharves . . . .' " (*Id.* at p. 923, quoting *Shirley v. City of Benicia* (1897) 118 Cal. 344, 346 [50 P. 404].) The circumstances, if any, in which the state could at some later time withdraw the dedication of any street shown on the subdivision map and employ it for another use were not presented in *State of California*; nor were those issues presented to us in *McGinn, supra*, 113 Cal.App. 695, which the Ninth Circuit relied upon, or in *Breed v. Cunningham* (1852) 2 Cal. 361, the case we relied upon in *McGinn*. Moreover, as we have observed, "[t]he public uses to which tidelands are subject are sufficiently flexible to encompass changing public needs" (*Marks v. Whitney, supra*, 6 Cal.3d 251, 259), and property subject to the tidelands trust can be placed under the use and control of private parties when necessary "for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains . . . ." (*Illinois Central, supra*, 146 U.S. 387, 453.) If, in adapting tidelands for public use "it is found necessary or advisable, in aid of the use, to cut off portions of it from access to navigable water, so that they become unavailable for navigation, the state has power to exclude such portions from the public use and, to that extent, revoke the original dedication." (*People v. California Fish Co., supra*, 166 Cal. 576, 597.)

In short, *State of California, supra*, 169 F.2d 914, does not support Zack's claim that Edgewater's leasehold must be enjoined because the land upon which it sits had irrevocably been dedicated to use as a street; nor is there any support for that proposition in our law. The purposes of the public trust would almost certainly be frustrated over time if a tidelands trustee could not accommodate changing public needs through the reallocation of resources to new public uses. While there are circumstances in which government may irrevocably commit the use of land to a particular public purpose (such as a constitutional provision that certain land preserves "shall be forever kept as wild forest lands" (N.Y. Const., art. XIV, § 1)) or must do so (as where the land was acquired by government under a deed restricting the use to which it may be put),[9] no such circumstances are here presented. Ordinarily, a public trustee's decision that trust land shall be used for a specific purpose, such as the dedication of such land as a street, stands only until the trustee decides to reallocate the land to some other public purpose or to dispose of it if that is

---

[9] The question "whether the government can or should be viewed as having made any irrevocable commitments about the use of particular governmental resources" is discussed in Sax, *The Public Trust Doctrine, supra*, 68 Mich. L.Rev. at pages 480–483.

congenial to the interests protected by the trust. As we have said, the questions regarding such a reallocation are whether the other use would be more restricted than the present use or would elevate the interests of private parties over the public interest. Zack's may be able to show that a reallocation of a portion of Humboldt Avenue to use as a commercial boat storage facility would suffer those deficiencies, but it has not done so yet. Accordingly, we reject Zack's claim that the dedication of Humboldt Avenue as a street can never be withdrawn by City and the land it sits on put to another public use.[10]

Thus we turn to Zack's alternative argument, which we find more substantial.

## V.

Accepting the determination we have just made, that a dedication of trust land as a street is not immutable, Zack's alternatively argues that the 1957 statute does not authorize City to vacate or close a tideland street in order to use it for another trust purpose without regard to general statutes relating to the vacation or closure of streets.

" 'The streets of a city belong to the people of the state, and every citizen of the state has a right to the use thereof, subject to legislative control. . . . The right of control over street traffic is an exercise of a part of the sovereign power of the state. . . . While it is true that the regulation of traffic upon a public street is of special interest to the people of a municipality, it does not follow that such regulation is a municipal affair, and if there is a doubt as to whether or not such regulation is a municipal affair, that doubt must be resolved in favor of the legislative authority of the state.' " (*City of Lafayette v. County of Contra Costa* (1979) 91 Cal.App.3d 749, 753 [154 Cal.Rptr. 374], quoting *Ex parte Daniels* (1920) 183 Cal. 636, 639 [192 P. 442]; accord, *Escobedo v. State of California* (1950) 35 Cal.2d 870, 875–876 [222 P.2d 1], overruled on other grounds by *Rios v. Cozens* (1972) 7 Cal.3d 792, 799 [103 Cal.Rptr. 299, 499 P.2d 979].) The field of traffic control is thus preempted by the state. (*Rumford v. City of Berkeley* (1982) 31 Cal.3d

---

[10] Because we shall declare the Edgewater leasehold in Humboldt Avenue an enjoinable nuisance for other reasons, we need not address Zack's claim that City's use of Humboldt Avenue for any purpose other than that of a street would constitute the taking of an interest in property by government, which under the Fifth Amendment cannot be done without compensation. Zack's analogizing of a rededication of a portion of Humboldt Avenue to a new use and a taking of private property by government seems problematic because the land "taken" has *always* belonged to the public as a whole. In any event, this issue, which has never been addressed by the parties and may turn on facts not yet established, will arise only if City vacates or closes the portion of Humboldt Avenue now occupied by the Edgewater leasehold in the manner prescribed by general statutes, which we proceed to describe.

545, 550 [183 Cal.Rptr. 73, 645 P.2d 124]; Veh. Code, § 21 ["no local authority shall enact or enforce any ordinance on the matters covered by this code unless expressly authorized herein"].) With a minor exception not here applicable,[11] a city is not expressly authorized to close a street for any purpose other than that it is unnecessary for present or future uses as a street. (*Citizens Against Gated Enclaves v. Whitley Heights Civic Assn.* (1994) 23 Cal.App.4th 812, 821 [28 Cal.Rptr.2d 451].) "What the City cannot do is wave the magic wand and declare a public street not to be a public street." (*Ibid.*)

 Under the specific statutes Zack's invokes, a legislative body of a local agency proposing "the complete or partial abandonment or termination of the public right to use a street, highway, or public service easement" (Sts. & Hy. Code, § 8309) must "set a hearing by fixing the date, hour, and place of the hearing and cause the publishing and posting of the notices" (*id.*, § 8320) in a newspaper (*id.*, § 8322) and also by "conspicuously [posting] notices of vacation along the line of the street, highway, or public easement proposed to be vacated" (*id.*, § 8323). At the hearing, the legislative body "shall hear the evidence offered by persons interested," and, if it "finds, from all the evidence submitted, that the street, highway, or public service easement described in the notice . . . is unnecessary for present or prospective public use, the legislative body may adopt a resolution vacating the street, highway, or public service easement," which shall be recorded. (*Id.*, § 8324; see *id.*, § 8325.) A legislative body may "summarily" vacate a street or highway only if, as is not here the case, the thoroughfare "has been superseded by relocation," or has been "impassable" for five consecutive years, or the vacation is pursuant to an agreement with the state department of transportation (*id.*, §§ 8330–8333), and the local legislative body adopts a "resolution of vacation" conforming to statutory requirements (*id.,* § 8335). If a local authority desires to close a street to vehicular traffic, it must comply with Vehicle Code section 21101, subdivision (a)(1), which provides that "Local authorities . . . may adopt rules and regulations by ordinance or resolution . . . [¶] (a) [to] [c]los[e] any highway to vehicular traffic when, in the opinion of the legislative body having jurisdiction, the highway is . . . [¶] (1) [n]o longer needed for vehicular traffic. . . ."[12]

*Ratchford v. County of Sonoma* (1972) 22 Cal.App.3d 1056 [99 Cal.Rptr. 887], illustrates the manner in which the statutes just described limit a local agency's discretion to vacate even a small portion of a public street. The trial

---

[11] Vehicle Code section 21101.4 permits the temporary closing of a street due to criminal activity after certain determinations have been made.

[12] Vehicle Code section 360 provides that " '[h]ighway' is a way or place of whatever nature, publicly maintained and open to the use of the public for purposes of vehicular travel. Highway includes street." Respondents have never maintained that Humboldt Avenue does not fit this definition.

court had denied the plaintiff, the owner of property abutting a mapped subdivision street, any relief from a resolution of a county board of supervisors vacating a portion of the mapped street (into which a residence slightly extended) as unnecessary for either present or prospective use. (*Id.* at pp. 1063–1064.) The Court of Appeal reversed with directions to enter judgment that the board of supervisors exceeded its jurisdiction and that the purported resolution of abandonment be declared void. Among other things, the court pointed out that the record failed to reveal any public benefit or interest in the abandonment of the portion of the rights of way involved. Significantly, in reliance on *Beals v. City of Los Angeles* (1943) 23 Cal.2d 381, 384–385 [144 P.2d 839], the court found that a property owner's private easement in the street appurtenant to the abutting property could not be defeated because, like Zack's, she had other access to her property. (*Ratchford v. County of Sonoma, supra,* 22 Cal.App.3d at p. 1069.)

The force of the street closure statutes is dramatized by *County of San Diego v. Cal. Water etc. Co., supra,* 30 Cal.2d 817. In that case, the defendant public utility was engaged in constructing a dam that, when completed and full, would flood a portion of a county highway, and the county sought to enjoin the flooding. The defendant claimed the county had waived damages and was estopped to obtain injunctive relief by its conduct. The county had previously sought and received from the defendant a " 'temporary right of way' " on its property that could be used by the public until the county completed a future permanent road north of the temporary route. (*Id.* at p. 819.) The easement was located almost exactly along the line of an original highway. The deed granting the easement provided that the right of way should revert to the defendant upon completion of the permanent highway, and also that by accepting the easement the county agreed that the defendant should not be liable to it for any claim or damages of any kind or nature whatsoever arising out of or in any manner connected with the building of the dam, including inundation of the easement. (*Ibid.*) The company later began construction of the dam without it or the county instituting a proceeding to determine whether the proposed use of the easement by the utility was more necessary to the public than its use as a highway. (*Id.* at p. 821.) The trial court ruled for the county, enjoining the defendant from flooding the road without first adequately compensating the county, and the Supreme Court affirmed. (*Id.* at pp. 818–823.)

■ In concluding that the county's agreement with the defendant was not a "binding contractual obligation," the Supreme Court emphasized that the methods by which county boards of supervisors may abandon public highways are solely those prescribed by the Streets and Highway Code, which requires "the fixing of a day for hearing, notice to all freeholders in the road district, publication of notice in a newspaper, hearing of evidence by any

party interested, and a finding that the road, or portion thereof, 'is unnecessary for present or prospective public use.' [Citation.]" (*County of San Diego v. Cal. Water etc. Co., supra,* 30 Cal.2d at p. 823.) As the court emphasized, "[t]he cases are apparently uniform to the effect that, *if the Legislature has provided a method by which a county or city may abandon or vacate roads, that method is exclusive.* [Citations.]" (*Ibid.,* italics added.) Contracts such as that between the county and the defendant were judicially disapproved, the court stated, "not only because they are unauthorized by legislation and would permit evasion of the statutory mode of procedure and safeguards but also, it is said, because they constitute improper attempts by the local officials to bind themselves in advance as to the exercise of their judgment in the future and, further, because the receipt of the agreed upon consideration might influence their future decision, which is to be made primarily upon considerations of public necessity for highway purposes. [Citations.]" (*Id.* at p. 824.) The contract at issue was void, the court concluded, "since there has been no notice, hearing, finding as to public necessity, or resolution of abandonment." (*Ibid.*)

City concedes it has never given the requisite notice, held a public hearing, and made a formal finding that the portion of Humboldt Avenue occupied by Edgewater's leasehold may be vacated or closed to other uses because it is unnecessary for present or prospective use as a public street, as required by Streets and Highways Code section 8324, subdivision (b), or closed to vehicular traffic because it is no longer needed for that purpose, as required by Vehicle Code section 21101, subdivision (a)(1). City maintains the lease was nevertheless "expressly authorized" by the 1957 statute; that is, that the provision of the 1957 statute authorizing it to lease portions of the conveyed tidelands for purposes consistent with the trust and with the requirements of commerce and navigation relieves it of the need to comply with the general statutes relating to street closure.

City asserts in its brief that the "method[s] by which a county or city may abandon or vacate roads" that were at issue in *County of San Diego v. Cal. Water etc. Co., supra,* 30 Cal.2d 817 and *Ratchford v. County of Sonoma, supra,* 22 Cal.App.3d 1056 (which are in amended form now prescribed by the sections of the Streets and Highway and Vehicle Codes previously described) are inapplicable in this case, because "here, the 1957 statute 'has provided a method' whereby the City, in its discretion, can lease ('vacate,' as it were) all or a portion of Humboldt Avenue." The situation in this case is "unique," City says, "since the 1957 Statute's 'method' for management of

these tidelands grant streets is different from ordinary 'abandonment' proceedings."[13] We cannot agree.

First of all, the portion of the 1957 statute City relies upon—that authorizing City to lease portions of the tidelands conveyed for a limited period of time for trust purposes—does not provide a "method" whereby City can vacate or close a tideland street it proposes to reallocate for another trust purpose pursuant to a lease. Nor does the language of the statute even imply that City's administration of the trust land conveyed is exempt from the requirements of facially applicable land use statutes, such as those relating to the vacating and closing of public streets. Indeed, the opposite inference is virtually compelled. The statute authorizes City to use the transferred trust land not only for a water harbor and related facilities but as well for "an airport or aviation facilities." It would be absurd to think that by authorizing City to use trust land for an airport, which would have significant environmental effects, the Legislature exempted it from the many state and federal laws regulating the placement, construction, operation, and maintenance of airports, such as, to take just one of many possible examples, the Airport Approaches Zoning Law. (Gov. Code, § 50485 et seq.) So far as we know, no court has ever suggested, and no tidelands trustee has ever claimed, that a special statute granting tidelands and submerged lands (of which there are many in California)[14] has the effect of empowering a trustee to administer the lands conveyed free from the constraints of facially applicable general land

---

[13] City also argues that any impairment of easement rights Zack's may have are not sufficiently substantial to warrant the relief it seeks, and that the summary judgment can be affirmed on that ground. The cases City relies upon do not involve the vacating or closing of a street but the question whether a street or other "improvement" (see, e.g., Sts. & Hy. Code, § 22525) impermissibly encroaches upon easement rights of owners of abutting property, which is primarily a factual question. (*People ex rel. Department of Public Works v. Ayon* (1960) 54 Cal.2d 217, 223 [5 Cal.Rptr. 151, 352 P.2d 519]; *Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1554 [49 Cal.Rptr.3d 259]; *Friends of H Street v. City of Sacramento* (1993) 20 Cal.App.4th 152, 167 [24 Cal.Rptr.2d 607]; see also *Genazzi v. County of Marin* (1928) 88 Cal.App. 545, 547 [263 P. 825].) Moreover, City's argument misses the point of Zack's alternative contention, which concedes City can vacate or close to vehicular traffic all or a portion of that land, but only after compliance with applicable statutes it has ignored. City's only response to this argument is that it represents an "intransigent effort to 'reverse' the trial court's decision on the permissibility of leasing under the 1957 statute." According to City, Humboldt Avenue has been neither vacated nor abandoned, as Zack's claims; "it simply has been *partially* leased, as it may be under state law." Thus, in the end, City falls back on the 1957 statute.

[14] Since the first legislative grant of sovereign tidelands and submerged lands to the City of Martinez in 1851, our Legislature had by 1976 enacted nearly 300 statutes granting tidelands and submerged lands to 65 governmental agencies in this state, including cities, counties, and water, sanitary, port and harbor districts, and also several public educational institutions. (State Lands Com., Rep. on Use, Development, and Administration of Granted Tidelands and Submerged Lands (1976) pp. 1, 12–18.) At that time, tidelands owned by the state and not granted in trust to any city, county or other local agency or to the United States existed in 15 counties. (State Lands Com., Inventory of Ungranted Tidelands (1981) p 1.) For examples of

use statutes.[15] This is not surprising, because the effect of exempting tidelands and submerged lands from such laws would offend public expectations and have destabilizing consequences, such as the suspension of general statutes specifically designed by the people's representatives to protect tidelands and submerged lands, including the Marine Life Protection Act (Fish & G. Code, § 2850 et seq.) and the McAteer-Petris Act (Gov. Code, § 66600 et seq.). "The function of the public trust as a legal doctrine is to protect such public expectations against destabilizing changes, just as we protect conventional private property from such changes." (Sax, *Liberating the Public Trust Doctrine from Its Historical Shackles* (1980) 14 U.C. Davis L.Rev. 185, 188, fn. omitted.)

 We do not know how many California streets are now situated upon reclaimed tidelands held in trust, but given the length of our coast and its many bays and the extensive development of our coastlands, we are confident there are thousands.[16] It cannot reasonably be supposed that the Legislature intended that governments holding these streets can summarily close them to vehicular traffic, even if they are heavily trafficked major thoroughfares, but can close nearby nontideland streets, even those of marginal use, only on the basis of a resolution or ordinance made upon a formal finding that the street is no longer needed for vehicular traffic after a noticed hearing on the issue. (Veh. Code, § 21101, subd. (a)(1).) The members of the public who benefit from the statutorily mandated decision process are also beneficiaries of the trust; the application of those democratic processes to the vacating or closing of tideland streets is no less salutary than its application to all other streets. "Any action which will adversely affect traditional public rights in trust lands is a matter of general public interest and should therefore be made only if there has been full consideration of the state's public interest in the matter; such actions should not be taken in some fragmentary and publicly invisible

---

statutes granting tidelands to municipalities see Stats. 1961, ch. 1763, pp. 3767–3770 (Albany); Stats. 1919, ch. 517, p. 1089 (Berkeley); Stats. 1911, ch. 676, p. 1304 (Long Beach); Stats. 1911, ch. 656, p. 1256 (Los Angeles); Stats. 1911, chs. 654, 657, pp. 1254, 1258 (Oakland).

[15] At least one court in another state has said there is no exemption from such general laws. In *State Bd. of Trustees v. Day Cruise Assoc.* (2001) 794 So.2d 696, a Florida District Court of Appeal invalidated a rule promulgated by the state agency holding title to and charged with managing trust lands because neither the broad responsibilities of the agency under the public trust doctrine nor the policies of that doctrine exempted it from operation of the state Administrative Procedure Act, which did not authorize the challenged rule.

[16] As of 1976, approximately 71 trustees administered more than 180 specific parcels of land in California then collectively comprising roughly 330,000 acres of tidelands and submerged lands. The major ports of San Diego, Long Beach, Los Angeles, San Francisco, Oakland, Stockton and Richmond, as well as numerous harbors in coastal counties are located on granted lands, as are scores of marinas, aquatic parks, fishing piers, and environmentally sensitive habitats. (State Lands Com., Rep. on Use, Development, and Administration of Granted Tidelands and Submerged Lands, *supra*, at p. 1.)

way. Only with such a safeguard can there b[e] any assurance that the public interest will get adequate public attention." (Sax, *The Public Trust Doctrine, supra*, 68 Mich. L.Rev. 471, 531.)

It also bears noting that City was long ago authoritatively advised that its power to realign or vacate public streets located on the trust lands it holds pursuant to the 1957 statute is no greater than its authority to vacate nontidelands streets. Shortly after receiving the trust lands granted by the 1957 statute, City learned that encroachments, namely piers, had been unlawfully erected on some of the dedicated streets located on that land. Desiring to realign some of those streets and vacate others, City sought from the Attorney General a formal opinion whether "[i]n the absence of state legislation expressly permitting Sausalito to do so, does its council have the same legal authority to vacate . . . tideland streets as it has to vacate non-tideland street areas." (37 Ops.Cal.Atty.Gen. 141 (1961).) Taking a position which, as we explain shortly, is strikingly inconsistent with his position in this case, the Attorney General opined that City "has authority under general statutes to vacate these tidelands streets *to the same extent that it may vacate non-tideland street areas.*" (*Id.* at p. 143, italics added.) The Attorney General concluded in 1961 that City's power to vacate tideland streets arises not under the tideland trust or the 1957 statute, but under "general statutes" of this state, providing "express authority to open, close, and realign public streets when the public interest or convenience requires any such acts [citations]." (*Id.* at pp. 141–142.)[17] The sections of the Streets and Highways and Vehicle Codes earlier described are such statutes, and the methods they prescribe are the "exclusive" methods by which a California street may be vacated or closed. (*County of San Diego v. Cal. Water etc. Co., supra*, 30 Cal.2d at p. 823; see also *City of Los Angeles v. Fiske* (1953) 117 Cal.App.2d 167, 172 [255 P.2d 445].)

■■■ As we have said, the statutory immunity provided by Civil Code section 3482 ("[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance") is available only where the acts complained of are either expressly authorized by the terms of the statute under which the justification is made or necessarily implied, " ' " 'so that it can be fairly stated that the Legislature contemplated the doing of the very act which occasions the injury.' " ' " (*Jordan v. City of Santa Barbara, supra*, 46 Cal.App.4th 1245, 1258.) The 1957 statute authorizing the lease of

---

[17] The vacation or closure of a tidelands street conflicts with the trust only if the use to which the vacated land is put is inconsistent with trust purposes. Thus the Attorney General's opinion correctly notes that realignment or closing of a tidelands street must be consistent with the trust "and access to and from navigable waters must not be substantially impeded although a reduction in the actual number of streets would not necessarily be inconsistent with the trust [citations]." (37 Ops.Cal.Atty.Gen., *supra*, at p. 142; see also *Lane v. City of Redondo Beach* (1975) 49 Cal.App.3d 251 [122 Cal.Rptr. 189].)

tidelands does not even imply, let alone expressly state, that the power to lease is free of the constraints of otherwise applicable state laws. Because there has been no notice, hearing, finding of public necessity, or resolution of vacation or closure of the portion of Humboldt Avenue upon which the Edgewater leasehold is situated, as required by the street closure statutes, the Edgewater leasehold is not maintained under the express authority of an applicable statute and can therefore be deemed a nuisance. (Civ. Code, § 3482.)

## VI.

The trial court apparently found it unnecessary to address Zack's claim that City's vacation or closure of Humboldt Avenue to accommodate Edgewater's boat storage facility violated the street closure statutes, and the immunity provided by Civil Code section 3482 is therefore inapplicable, because the court accepted state respondents' contention that the basis of all of Zack's causes of action was a purely private easement interest in the street that had been extinguished by Edgewater's adverse use of the street for 25 years. According to state respondents, Zack's property rights derive entirely from those conveyed by the state to its predecessor in interest in 1871, and the state cannot give a private party, and did not convey to Zack's predecessor in interest, such title as would empower it to delimit or modify City's power as trustee to designate the public use to which tidelands (including that upon which the Edgewater leasehold is situated) will be put. This argument can easily be dispatched.

 The easement interest Zack's asserts arises not under the patent but under the common law; it is described in the seminal case of *Williams v. Los Angeles Ry. Co.* (1907) 150 Cal. 592 [89 P. 330] (*Williams*) as follows: "Every lot fronting upon a street has, as appurtenances thereto, certain private easements in the street, in front of and adjacent to the lot, which easements are a part of the lot, and are private property as fully as the lot itself, though exercised in the street and extending into and over the street. Any obstruction to the use of the street which impairs or destroys these easements is a private injury, special and peculiar to the owner of the lot . . . . [¶] These private easements are,—1. The right of ingress and egress to and from the lot over and by means of the adjacent portion of the street [citations]; 2. The right to receive light from the space occupied by the street, and to the circulation of air therefrom [citations]; and 3. The right to have the street space kept open so that signs or goods displayed in and upon the lot may be seen by the passerby, in order that they may be attracted as customers to patronize the business carried on thereon. [Citations.]" (*Id.* at pp. 594–595.) "These rights are not dependent upon the intent of the political subdivision which constructs the street; rather, they arise as a matter of law when a highway is

established, irrespective of the mode by which it is established." (*Short Line Associates v. City and County of San Francisco* (1978) 78 Cal.App.3d 50, 55 [143 Cal.Rptr. 921].)

The right described in *Williams, supra,* 150 Cal. 592, was at issue in *Strong v. Sullivan* (1919) 180 Cal. 331 [181 P. 59]. In that case, the trial court denied the plaintiff injunctive relief against the defendant, who owned and, pursuant to a license granted by the city under the authority of an ordinance, operated a portable lunch wagon each evening on a public street adjacent to the plaintiff's property. The trial court reasoned that the license under the ordinance constituted permission to establish the defendant's business in the street without regard to surrounding conditions. (*Id.* at pp. 332–333.) The Supreme Court disagreed: "The finding that defendant's wagon obstructed the ingress and egress of plaintiff and his tenants to and from his property, and interfered with the free use of the public street in front of his building, was equivalent to a holding that defendant was maintaining a public nuisance which was especially injurious to plaintiff and which, therefore, might be enjoined at his suit, because any injury to the use of the street which impairs plaintiff's private easements in the street in front of and adjacent to his lot amounts to an injury giving plaintiff, as an abutting owner, the right to maintain an action for damages or for an injunction." (*Id.* at p. 333; see also *Western States etc. Co. v. Bayside L. Co., supra,* 182 Cal. 140, 144–145 [city has "no power to authorize the use of a street for a lumber-yard"].)

▮ "[I]t is a familiar and well-established principle that the owner of a lot abutting on a street has an easement or right of way over it, which in the strictest sense of the word is property. [Citations.]" (*McLean v. Llewellyn Iron Works* (1905) 2 Cal.App. 346, 348 [83 P. 1082].) Impairment of that property right constitutes both a private and a public nuisance. (*Friends of H Street v. City of Sacramento, supra,* 20 Cal.App.4th at p. 160.) Zack's has a direct remedy to abate a public nuisance that is a private nuisance as to it if the nuisance is "specially injurious to himself, but not otherwise" (Civ. Code, § 3493), and there is no question that an owner of property abutting a public street is specially injured by an obstruction of that street. (*McLean v. Llewellyn Iron Works,* at p. 348.) ▮ Because the nuisance Zack's alleges fits the statutory definition of a public nuisance (Civ. Code, § 3480), it cannot be time-barred. (Civ. Code, § 3490; *McLean v. Llewellyn Iron Works,* at p. 350.)

## VII.

Finally, we turn to state respondents' suggestion that any acknowledgement of Zack's easement interest in Humboldt Avenue would violate the public trust doctrine because that doctrine vests in the trustee "absolute power" to

determine the use to which tidelands will be put.[18] This idea rests upon the statement in *Marks v. Whitney, supra,* 6 Cal.3d 251, that "[t]he power of [a public trustee] to control, regulate and utilize its navigable waterways and the lands lying beneath them, when acting within the terms of the trust, is *absolute* . . ." (*id.* at p. 260, italics added), and the statement in *Colberg, Inc. v. State of California ex rel. Dept. Pub. Wks., supra,* 67 Cal.2d 408, that the state's "power to control, regulate and utilize [navigable] waters within the terms of the trust is absolute except as limited by the paramount supervisory power of the federal government over navigable waters." (*Id.* at pp. 416–417.) State respondents misconstrue these statements.

Judicial characterization of the power of a tidelands trustee as "absolute" has caused confusion because that word "can have, and persistently has had, several different meanings in the public trust context." (Note, *The Public Trust in Tidal Areas: A Sometime Submerged Traditional Doctrine* (1970) 79 Yale L.J. 762, 779.) The adjective "absolute" is most commonly used in tideland cases to single out a particular type of public easement as superior to all others.[19] "Absolute" can also be used to mean that a public trust easement

---

[18] State respondents advance this claim primarily in opposition to Zack's causes of action to quiet title and for declaratory relief, because the nuisance claim is only against City and Edgewater; however, the state sees the nuisance claim as an attempt to "revive" a stale easement or "transmute its causes of action into a nuisance action against the state." In fact, all of Zack's causes of action relate to the same public/private easement interest. Zack's seeks to quiet title to its "right of ingress and egress to and from [its] lot over and by means of the adjacent portion of [Humboldt Avenue] . . . , [t]he right to receive light from the space occupied by the street, and to the circulation of air therefrom . . . , and . . . [t]he right to have the space kept open so that signs or goods displayed in and upon [its] lot may be seen by the passerby, in order that they may be attracted as customers to patronize the business carried on therein." By its cause of action for declaratory relief, Zack's seeks an adjudication that City does not have authority "to itself use or by lease authorize a use of Humboldt Avenue in a manner that blocks full access and ingress of the street [*sic*] and that interferes with [Zack's] easement rights . . . ."

[19] Though even here there can be confusion. Public trust theory protects many interests and they can be ranked hierarchically (see discussion, *ante,* at p. 1180, fn. 8); so that an interest subordinate to a paramount right can nevertheless be characterized as "absolute" as to all lesser rights. It has been suggested that "this usage can have ill effects. For example, certain 'lesser' protections will be defined as separate from the public trust theory so they may co-exist logically alongside the greater protections. More seriously, the courts may be over-cautious in recognizing important public interests in tidal areas because they feel that recognition would entail protecting the interest to the same degree as the prototype (and most vigorously defended) public trust theory right—navigation. [¶] As more interests are taken into consideration, as they have been and will have to be in our increasingly congested environment, the mechanistic advantages of this . . . use of 'absolute' turn increasingly into costly rigidities that distort the weighing process for doctrinal reasons." (Note, *The Public Trust in Tidal Areas: A Sometime Submerged Traditional Doctrine, supra,* 79 Yale L.J. at p. 780, fn. omitted.)

is inextinguishable, or that "[t]he package of all public interests is absolute *vis-a-vis* any and all conflicting private interests . . . ." (79 Yale L.J. at p. 780.)

It is in the latter sense that the word was used in *Marks v. Whitney, supra*, 6 Cal.3d 251. No public trustee was a party to that case, which was a quiet title action to settle a boundary line dispute caused by overlapping and defective surveys and to enjoin the defendants (Whitney) from asserting any claim or right in or to the property of the plaintiff (Marks). (*Id.* at p. 256.) Understood in context, the statement in the opinion that the power of the state to control, regulate and utilize the trust land at issue was "absolute" meant only that the plaintiff's private property rights had to submit to the burden of the public easement created by the state in the exercise of its trust power. While the judicial resolution preserved the public right, so too did the court note that the private right of the plaintiff was entitled to " 'as full effect as the public interests will permit.' " (*Marks v. Whitney*, at p. 259.) The court was also careful to note that, unlike the present case, "[w]e are not here presented with any action by the state [or a successor trustee] . . . modifying, terminating, altering or relinquishing the *jus publicum* in these tidelands . . . ." (*Id.* at p. 260.)

The state power described in *Colberg, Inc. v. State of California ex rel. Dept. Pub. Wks., supra*, 67 Cal.2d 408, as "absolute" was not based on the public trust doctrine but on the navigation servitude doctrine, sometimes referred to as a " 'superior navigation easement,' " which arises under the Commerce Clause. (*United States v. Twin City Power Co.* (1956) 350 U.S. 222, 224–225 [100 L.Ed. 240, 76 S.Ct. 259]; see *Scranton v. Wheeler* (1900) 179 U.S. 141, 160 [45 L.Ed. 126, 21 S.Ct. 48].) This servitude applies only in cases in which the private right allegedly impaired is that of access *to navigable waters* (a right Zack's fully possesses independently of Humboldt Avenue and does not claim City has impaired). Under the navigation servitude, an individual's private right of access must always give way to a public right that cannot otherwise be accommodated; so that the state's power to subordinate the private to the public right is sometimes, as in *Colberg*, said to be "absolute." Although the navigation servitude is most often employed by the federal government, a state navigation servitude, inferior only to the federal servitude, does exist. (Comment, *The State Navigation Servitude* (1969) 4 Land & Water L.Rev. 527.) Though a state may use the navigation servitude doctrine to accomplish tideland trust purposes, and it is for that reason sometimes conflated with the public trust doctrine, the navigation servitude is a separate doctrine.[20] (*Colberg, Inc. v. State of California ex rel.*

---

[20] The navigation servitude is like the power of eminent domain in that both are means of putting private property to public use, but there is an important difference. Under the eminent domain power, the government can acquire private property for public ownership only if, as

*Dept. Pub. Wks., supra*, 67 Cal.2d at p. 419, fn. 10.) In any case, the power of the state to improve utilization of navigable water was declared "absolute" in *Colberg* only vis-à-vis the plaintiffs' private right of access to such waters, which conflicted with the superior state servitude. *Colberg* hardly supports state respondents' extravagant suggestion that Zack's rights in an abutting public street are wholly subservient to City's "absolute power" as tidelands trustee.

 While the power vested in a tidelands trustee to define and enforce a particular public easement may in some senses be called "absolute," it is nevertheless *always* "subject to certain expressed reservations and restrictions" and *never* greater than that "commensurate with the duties of the trust." (*People v. California Fish Co., supra*, 166 Cal. at p. 597.) Thus a tidelands trustee lacks unrestricted power not only to dispose of a tidelands street in a manner that conflicts with trust purposes (*Lane v. City of Redondo Beach, supra*, 49 Cal.App.3d 251), but also to impair private rights in trust land more substantially than is necessary to protect public interests therein (*Marks v. Whitney, supra*, 6 Cal.3d at p. 259). State respondents fail to see that unlike the claimants in *People v. California Fish Co., supra*, 166 Cal. 576, *City of Berkeley v. Superior Court, supra*, 26 Cal.3d 515, and several other cases they rely upon, who asserted that they owned tidelands entirely free of the public trust, the easement rights Zack's urges us to enforce have not been shown to conflict with paramount interests of the public in trust land. Judicial vindication of those rights therefore would not effect the "individual expropriation" of tidelands that state respondents posit. As we said in *Arques v. City of Sausalito, supra*, 126 Cal.App. 2d 403, 405, a case involving the same municipality and tidelands involved in this case, the full rights to use a tideland street for ingress to and egress from a property abutting that street are "recognized and protected" by the tidelands trust.
 The public trust doctrine therefore allows a leasehold interfering with public and private rights to use a tidelands street to be adjudicated a nuisance and enjoined for the failure of the trustee to comply with the street closure statutes.

required by the Fifth Amendment, the former owner is compensated. No such prohibition applies in connection with the navigation servitude. Because title to tidelands and submerged lands was from the beginning "subject to the servitude in respect of navigation created in favor of the Federal government by the Constitution" (*Gibson v. United States* (1897) 166 U.S. 269, 272 [41 L.Ed. 996, 17 S.Ct. 578]), any damage resulting from the "improvement of a navigable highway, for the public good," is deemed not to have been "the result of a taking," but "merely incidental to the exercise of a servitude to which [the] property had always been subject" (*id.* at p. 276), and compensation is therefore not required.

## DISPOSITION

For the foregoing reasons, the trial court's grants of summary judgment were error. The judgments are reversed and the matter remanded to the trial court for further proceedings consistent with this opinion. Costs on appeal are awarded to Zack's.

Lambden, J., and Richman, J., concurred.

## Appendix

### Stats. 1957, ch. 791, § 2, pp. 2002–2004

### CHAPTER 791

*An act conveying certain tidelands and lands lying under inland navigable waters, situate in San Francisco Bay, to the City of Sausalito, for public purposes and benefits, and providing for the government, management and control thereof, reserving rights to the State; and in connection therewith repealing Chapter 913 of the Statutes of 1951 and Chapter 534 of the Statutes of 1953.*

[Approved by Governor June 5, 1957. Filed with Secretary of State June 6, 1957.]

*The people of the State of California do enact as follows:*

SECTION 1. Chapter 913 of the Statutes of 1951 and Chapter 534 of the Statutes of 1953 are repealed.

SEC. 2. There is hereby granted and conveyed to the City of Sausalito, County of Marin, all of the right, title, and interest of the State of California, held by virtue of its sovereignty, in and to all tidelands and submerged lands of San Francisco Bay, whether filled or unfilled, situated and lying within the boundaries of the incorporated area of said city, as such boundaries exist on the effective date of this act, to be forever held by said city, and its successors, in trust for the uses and purposes and upon the express conditions following, to wit:

(a) That said lands shall be used by said city, and its successors, for the establishment, improvement and conduct of a harbor, including an airport or aviation facilities, and for the construction, maintenance and operation thereon of wharves, docks, piers, slips, quays and other utilities, structures, facilities and appliances necessary or convenient for the promotion and accommodation of commerce and navigation by air as well as by water, and for the construction, maintenance, and operation thereon of public buildings and public parks and playgrounds, and for public recreational purposes, and said city, or its successors, shall not at any time, grant, convey, give or alien said lands, or any part thereof, to any individual, firm or corporation for any purposes whatsoever; provided, that said city, or its successors, may grant franchises thereon and may lease said lands, or any part thereof, for limited periods (but in no event exceeding 50 years), for purposes consistent with the trust upon which said lands are held by the State of California, and with the

requirements of commerce and navigation at said harbor, and collect and retain rents from such leases, franchises and privileges.

(b) That said lands shall be improved by said city without expense to the State, and shall always remain available for public use for all purposes consistent with the trust under which the State holds sovereign lands, and the State of California shall have at all times the right to use, without charge, all wharves, docks, piers, slips, quays, and other improvements and facilities constructed on said lands, or any part thereof, for any vessel or other watercraft or aircraft, or railroad, owned or operated by the State of California.

(c) That in the management, conduct or operation of said harbor, or of any of the utilities, structures or appliances mentioned in paragraph (a) hereof, no discrimination in rates, tolls or charges or in facilities for any use or service in connection therewith shall ever be made, authorized or permitted by said city or its successors.

(d) The absolute right to fish in the waters of said harbor, with the right of convenient access to said waters over said lands for said purpose, is hereby reserved to the people of the State of California.

(e) There is hereby excepted and reserved to the State of California all deposits of minerals, including oil and gas, in said lands, and to the State of California, or persons authorized by the State of California, the right to prospect for, mine, and remove such deposits from said lands.

(f) The lands herein described are granted subject to the express reservation and condition that the State may at any time in the future use said lands or any portion thereof for highway purposes without compensation to the city, its successors or assigns, or any person, firm or public or private corporation claiming under it, except that in the event improvements have been placed upon the property taken by the State for said purposes, compensation shall be made to the person entitled thereto for the value of his interest in the improvements taken or the damages to such interests.